# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

SHARON BAUER; RICHARD JURGENA,

*Plaintiffs-Appellants,*

*v.*

MARC ELRICH, in his official capacity as Montgomery County Executive; RAYMOND L. CROWEL, in his official capacity as Director of Montgomery County Department of Health and Human Services,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, Case No. 8:20-cv-01212-PJM
Before the Honorable Peter J. Messitte

## BRIEF FOR APPELLEES

PAUL R.Q. WOLFSON
CATHERINE M.A. CARROLL
LEON T. KENWORTHY
ALEX HEMMER
ALEXANDRA STEWART
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
(202) 663-6000

September 9, 2020

MARC P. HANSEN
County Attorney
JOHN P. MARKOVS
Deputy County Attorney
101 Monroe Street, Third Floor
Rockville, MD 20850
(240) 777-6700
marc.hansen@montgomerycountymd.gov

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ......................................................4

COUNTER-STATEMENT OF ISSUES .................................................4

STATEMENT OF THE CASE................................................................4

    A.    The COVID-19 Pandemic And Federal And State Responses ...........................................................................4

    B.    The Emergency Assistance Relief Payment Program.........................6

    C.    Proceedings Below .........................................................8

SUMMARY OF ARGUMENT .............................................................11

STANDARD OF REVIEW ..................................................................13

ARGUMENT ......................................................................................13

I.    THE DISTRICT COURT HAD JURISDICTION .......................................13

II.    PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION TO ENFORCE § 1621................................................................20

    A.    Section 1621 Creates No Private Right Of Action .............................21

    B.    Maryland Law Does Not And Cannot Supply A Cause Of Action ......................................................................23

        1.    Maryland law does not authorize taxpayer suits to enforce federal statutes containing no private right of action................................................24

        2.    Federal law, not state law, controls Plaintiffs' right to a judicial remedy to enforce § 1621 ...................27

III.    THE EARP PROGRAM COMPLIES WITH § 1621 ..............................33

i

A.     Section 1621(d)'S Reference To "State Law" Includes Laws Enacted By State Subdivisions Pursuant To State-Delegated Lawmaking Authority ........................................................33

B.     Montgomery County Enacted The EARP Program Pursuant To A Delegation Of The State's Legislative Power ......................................................................................38

IV.     APPLYING § 1621 TO INVALIDATE THE EARP PROGRAM WOULD VIOLATE THE TENTH AMENDMENT ................................................43

A.     Under Plaintiffs' Reading, § 1621 Would Impermissibly Interfere With The Structure And Functions Of State Governments ......................................................................44

B.     Applying § 1621 To Invalidate The EARP Program Would Violate The Anti-Commandeering Principle ..........................47

C.     Plaintiffs' Arguments Lack Merit .......................................49

CONCLUSION ........................................................................................54

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page

*Alden v. Maine*, 527 U.S. 706 (1999) ...................................................45

*Alexander v. Sandoval*, 532 U.S. 275 (2001)..........................2, 21, 22, 23

*Allen v. Cooper*, 140 S. Ct. 994 (2020)................................................52

*Anne Arundel County v. Bell*, 113 A.3d 639 (Md. 2015) ..................24, 25

*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015)............................................45

*Arizona v. United States*, 567 U.S. 387 (2012)......................................51

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015).......................23

*Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011)...............29

*Bell v. Hood*, 327 U.S. 678 (1946).......................................................31

*Bennett v. Montgomery County*, 2019 WL 4187399 (Md. Ct. Spec. App. Sept. 3, 2019) .........................................................24

*Bernal v. Fainter*, 467 U.S. 216 (1984) ...............................................50

*Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir. 1990) ............28, 29

*Burrell v. Bayer Corp.*, 918 F.3d 372 (4th Cir. 2019) ............. 13, 14, 17, 19, 20, 31

*Calloway v. Lokey*, 948 F.3d 194 (4th Cir. 2020)..................................13

*Cannon v. University of Chicago*, 441 U.S. 677 (1979)..........................21

*Chamber of Commerce of United States v. Whiting*, 563 U.S. 582 (2011)..........................................................50

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988) ...........14, 16

*City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002) .........................................................35

*City of Chicago v. International College of Surgeons*, 522 U.S. 156
(1997)............................................................................................15

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) .........53

*City of Columbus v. Ours Garage & Wrecker Service, Inc.*,
536 U.S. 424 (2002)..........................................3, 12, 34, 36, 38, 42

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018)..................53

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .............................35

*Clark v. Velsicol Chemical Corp.*, 944 F.2d 196 (4th Cir. 1991).....................30, 31

*Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438
(4th Cir. 2014) ...............................................................................22

*Comcast Corp. v. National Association of African American-Owned
Media*, 140 S. Ct. 1009 (2020) ...........................................3, 20, 27

*County Council v. Investors Funding Corp.*, 312 A.2d 225 (Md. 1972)................40

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)............................................20

*Dandridge v. Williams*, 397 U.S. 471 (1970) ..........................................51

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ..................................35

*Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007) ........................................22

*DeCanas v. Bica*, 424 U.S. 351 (1976)...................................................50

*District of Columbia v. John R. Thompson Co.*, 346 U.S. 100 (1953)...................45

*Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811 (4th Cir. 2004)..............................30, 31

*Dotson v. Chester*, 937 F.2d 920 (4th Cir. 1991) ....................................35

*Edwards Systems Technology v. Corbin*, 841 A.2d 845 (Md. 2004) .....................46

*Flast v. Cohen*, 392 U.S. 83 (1968) ........................................................25

*Florida Prepaid Postsecondary Education Expense Board v. College
Savings Bank*, 527 U.S. 627 (1999)................................................52

iv

*Floyd v. Mayor & City Council of Baltimore*, 205 A.3d 928
    (Md. 2019) ............................................................................24

*Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177
    (4th Cir. 2014) ......................................................................14

*Franchise Tax Board of California v. Construction Laborers Vacation
    Trust*, 463 U.S. 1 (1983) .....................................................14

*Frothingham v. Mellon*, 262 U.S. 447 (1923) ..............................20

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ...................2, 21, 22

*Grable & Sons Metal Products, Inc. v. Darue Engineering
    & Manufacturing*, 545 U.S. 308 (2005) .............. 11, 14, 15, 17, 18, 19, 20

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)............... 3, 12, 13, 34, 43, 44, 45, 46, 49

*Grochowski v. Phoenix Construction*, 318 F.3d 80 (2d Cir. 2003) .........................32

*Gunn v. Minton*, 568 U.S. 251 (2013) ..............................15, 17, 18, 19

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) ...........................5

*Highland Farms Dairy v. Agnew*, 300 U.S. 608 (1937) .........................45

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
    471 U.S. 707 (1985).............................................................35

*Horace Mann League of United States of America, Inc. v. Board of
    Public Works*, 220 A.2d 51 (Md. 1966) ..............................25

*Howlett v. Rose*, 496 U.S. 356 (1990) ........................................28

*In re Commonwealth's Motion to Appoint Counsel¸ 790 F.3d 457
    (3d Cir. 2015)........................................................................29

*In re Miller*, 124 F. App'x 152 (4th Cir. 2005) ........................27

*In re Vargas*, 10 N.Y.S.3d 579 (App. Div. 2015)...............46, 47

*Jaco v. Bloechle*, 739 F.2d 239 (6th Cir. 1984)........................29

*Jefferies v. District of Columbia*, 917 F. Supp. 2d 10 (D.D.C. 2013) ....................32

*Johnson v. System Connection of Maryland, Inc.*, 2016 WL 4124214
(D. Md. Aug. 2, 2016) ...................................................................32

*Jones v. United States*, 529 U.S. 848 (2000) ....................................44, 47

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) ........................51

*Koenick v. Felton*, 190 F.3d 259 (4th Cir. 1999) ................................20

*Kofa v. INS*, 60 F.3d 1084 (4th Cir. 1995) ...............................................38

*Korab v. Fink*, 797 F.3d 572 (9th Cir. 2014) .........................................51

*Lawson v. Union County Clerk of Court*, 828 F.3d 239 (4th Cir. 2016) ................13

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005) .......................................51

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ...................................................................25, 26

*Maine Community Health Options v. United States*, 140 S. Ct. 1308
(2020) ...................................................................................21

*McBurney v. Young*, 667 F.3d 454 (4th Cir. 2012) ..................................43

*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986) ...........11, 18

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct.
1562 (2016) .................................................................................17

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ...........................28

*Moor v. Alameda County*, 411 U.S. 693 (1973) .........................................10, 27, 28

*Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148
(4th Cir. 1994) ...........................................................................19, 30, 31

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018) ............. 13, 44, 47, 48, 49, 51, 52, 53, 54

*Murray v. Comptroller of Treasury*, 216 A.2d 897 (Md. 1966) ...........................25

*New York v. United States*, 505 U.S. 144 (1992) .......................................44, 47, 52

*Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004) ...................................34

*Planned Parenthood South Atlantic v. Baker*, 941 F.3d 687 (4th Cir. 2019) ............................................................. 32

*Printz v. United States*, 521 U.S. 898 (1997) ...................... 48, 52

*Ripley v. Foster Wheeler LLC*, 841 F.3d 207 (4th Cir. 2016) ................................. 13

*Spokeo, Inc. v Robins*, 136 S. Ct. 1540 (2016) ................................. 32, 33

*State Center, LLC v. Lexington Charles Limited Partnership*, 92 A.3d 400 (Md. 2014) ............................................. 24, 25, 26

*State v. Stewart*, 137 A. 39 (Md. 1927) ............................ 39

*Steimel v. Board of Election Supervisors*, 357 A.2d 386 (Md. 1976) .............. 40, 41

*United States v. California*, 921 F.3d 865 (9th Cir. 2019), *cert. denied*, No. 19-532 (U.S. June 15, 2020) ................................ 53

*Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991) .................. 34, 35, 37

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ............................ 21

## DOCKETED MATERIALS

*DeCanas v. Bica*, No. 74-882, 1975 WL 173815 (U.S. Sept. 19, 1975) ................ 50

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. art. I, § 8, cl. 4 ..................................................... 49

Md. Const. art. XI-A
§ 2 .................................................................... 39
§ 3 .................................................................... 42
§ 4 .................................................................... 41

8 U.S.C.
§ 1621 .................................................. 1, 8, 12, 22, 33
§ 1623 .................................................................. 22
§ 1624 .................................................................. 37

15 U.S.C. § 9023 ....................................................... 5

26 U.S.C. § 6428 ....................................................... 5

28 U.S.C.
§ 1291 ....................................................................................4
§ 1331 ........................................................................1, 4, 9, 14
§ 1441 ....................................................................................9

42 U.S.C.
§ 1983 ..............................................................................28, 29
§ 1988 ..................................................................................28

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No.
116-136, 134 Stat. 281 (2020) ............................................5

Pub. L. No. 104-193, 110 Stat. 2260 (1996)......................................33, 34

2020 Md. Laws, ch. 245 (May 8, 2020) ..................................................42

2020 Md. Laws, ch. 331 (May 8, 2020) ..................................................42

Md. Code Ann., Lab. & Empl. § 8-905 ....................................................6

Mont. Cty. Code 1965, ch. 49, art. I, § 49-5 (modifying 1912 Md.
Laws, ch. 790, § 464) ......................................................41

## OTHER AUTHORITIES

6 Larsen, Sonja, *Maryland Law Encyclopedia Counties* § 10 (2020).....................39

Montgomery County Government COVID-19 Information Portal,
https://www.montgomerycountymd.gov/covid19/ (last visited
Sept. 9, 2020)..................................................................5

**INTRODUCTION**

In response to the severe economic hardship caused by the COVID-19 pandemic, Montgomery County created the Emergency Assistance Relief Payment ("EARP") Program, a temporary and desperately needed lifeline aimed at helping the County's most vulnerable residents feed their families and afford housing. Plaintiffs filed suit to declare the program unlawful and enjoin that desperately needed assistance, based on no particularized injury apart from their status as two of the County's hundreds of thousands of taxpayers.

Plaintiffs assert a single claim—that the EARP Program violates 8 U.S.C. § 1621, which prohibits the disbursement of certain state and local benefits to undocumented noncitizens, *id.* § 1621(a), unless they are made eligible "through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility," *id.* § 1621(d). Because Plaintiffs seek to enforce a federal statute, Defendants removed the case to federal district court. Plaintiffs never challenged removal, but "concur[red]" in federal jurisdiction. JA294. The district court agreed removal was proper and granted summary judgment to Defendants on the ground that Plaintiffs have no private right of action to enforce § 1621.

Having lost, Plaintiffs reverse course to argue that the district court lacked jurisdiction. That gambit fails. This case "aris[es] under" federal law, 28 U.S.C. § 1331, because Plaintiffs' right to relief depends on resolution of substantial and

disputed questions of federal law—*i.e.*, the proper interpretation of § 1621 and its application to the EARP Program.

On the merits, the district court properly ruled for Defendants because § 1621 is not privately enforceable—as Plaintiffs concede (at 15), § 1621 creates no express or implied private right of action. Section 1621 contains no "rights-creating language" or any other indication that Congress intended to create a judicial remedy for private attorneys general. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 & n.3 (2002). The statute focuses solely on States and localities' conduct, not on any purported right of taxpayers or other beneficiaries. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Indeed, it would be especially improbable for Congress to confer a private right of action on such a broad class as "all taxpayers" who have no more stake in § 1621's enforcement than a *de minimis* share in the funding of local benefits programs.

Plaintiffs argue that they can bring suit under a state-law cause of action for Maryland's taxpayers, even though their sole theory of liability is that Defendants violated a *federal* statute. That argument misreads both Maryland and federal law. No Maryland court has applied the state-law taxpayer-standing doctrine where a plaintiff seeks to enforce any federal statute, much less one that Congress has not made privately enforceable. In any event, even if Maryland law would allow it, federal law would not. A private right of action to enforce a federal law must be

2

created by Congress, not by state courts. *Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020).

No more is needed to affirm the judgment. But even if Plaintiffs had a private right of action, their suit would fail because the EARP Program does not violate § 1621. Section 1621(d) allows benefits to be paid to noncitizens so long as "State law" authorizes the payments. And absent a clear contrary statement, a federal statutory reference to "state law" should be construed to include law made by a State's political subdivisions pursuant to state-delegated authority. *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 428-429 (2002). That rule respects States' "traditional prerogative … to delegate their authority to their constituent parts" as they see fit, *id.* at 429, and it avoids grave constitutional concerns that would arise from congressional efforts to dictate how States must structure their lawmaking processes, *see Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Here, Maryland exercised its "traditional prerogative" by transferring to charter counties certain lawmaking functions that were once performed by the state legislature. Montgomery County enacted the EARP Program pursuant to that authority, so the program satisfies § 1621(d).

If § 1621 were applied to reach a contrary result, the statute would violate the federalism principles embodied in the Tenth Amendment—both by trenching on States' authority to allocate lawmaking power as they see fit and by

commandeering state and local governments to govern in accordance with Congress's instructions. But this Court need not confront those issues. It should affirm on the ground that Plaintiffs have no private right of action.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331. JA294. This Court has jurisdiction under 28 U.S.C. § 1291.

## COUNTER-STATEMENT OF ISSUES

1.      Whether the district court had federal-question jurisdiction.

2.      Whether Plaintiffs lack a private right of action to enforce § 1621.

3.      Whether, if the Court disagrees with the district court's holding, it should nonetheless affirm on the grounds that the EARP Program does not violate § 1621(d) or that § 1621 contravenes the Tenth Amendment.

## STATEMENT OF THE CASE

### A.      The COVID-19 Pandemic And Federal And State Responses

The spread of COVID-19 has caused a public health and economic crisis in the United States, including Maryland. Efforts to contain the virus's spread by closing businesses and ordering most residents to stay home, although necessary, have caused widespread and acute economic hardship. Montgomery County has been hard hit. As of September 9, 2020, 20,838 of the County's 1.05 million

residents have been confirmed infected, and 790 have lost their lives.[1]  Thousands of residents have filed claims for unemployment insurance.  JA130-131.  Low-income immigrants, including many undocumented immigrants, work in industries that have been particularly hurt by layoffs and closures.  JA134.

Congress addressed the economic distress caused by the pandemic in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020).  The CARES Act authorized one-time federal payments to U.S. citizens and certain immigrants with permanent status of up to $1,200 per adult for individuals and $500 per child.  26 U.S.C. § 6428(a).  The CARES Act excluded from eligibility individuals who can be claimed as dependents by other taxpayers, individuals without social security numbers, and noncitizens who are not legal permanent residents.  *Id.* §§ 6428(d)(1)-(2), 6428(g).

The CARES Act also temporarily supplemented state unemployment insurance by providing that recipients of state unemployment-insurance benefits who lost work due to the pandemic could receive an additional $600 per week until July 31, 2020.  15 U.S.C. § 9023(b)(1).  Under Maryland law, unemployment benefits are available only to U.S. citizens, lawful permanent residents, and

---

[1] *See* Montgomery County Government COVID-19 Information Portal, https://www.montgomerycountymd.gov/covid19/ (last visited Sept. 9, 2020); *see also Hall v. Virginia*, 385 F.3d 421, 424 & n.3 (4th Cir. 2004) (taking judicial notice of statistics published on official state website).

persons lawfully present in the United States to perform the covered employment. Md. Code Ann., Lab. & Empl. § 8-905(a).  Thus, the CARES Act and Maryland unemployment insurance exclude, among others, all undocumented immigrants.

**B.    The Emergency Assistance Relief Payment Program**

Recognizing the gaps created by the exclusions from CARES Act relief and Maryland unemployment insurance, Montgomery County enacted the Emergency Assistance Relief Payment ("EARP") Program to provide financial assistance to County residents who are not eligible for other COVID-19-related state and federal assistance.  JA138.  County Executive Marc Elrich initially proposed the EARP Program on March 23, 2020.  JA81.

The Montgomery County Council authorized and funded the EARP Program through two special appropriations measures.  On March 31, 2020, the County Council unanimously approved Resolution 19-411 to appropriate $5 million for financial assistance in response to the public health emergency.  JA67.  In late April 2020, County Executive Elrich requested additional funds, JA88, and the County Council approved Resolution 19-439 to appropriate an additional $5 million for the EARP Program.  *See* JA109.  The Council explained that "[t]he COVID-19 public health crisis has closed non-essential businesses leaving many county residents with no or significantly reduced income and facing extreme financial hardship."  JA88.  The Council further explained that "[l]ow-income

households were rent burdened and financially stressed prior to the COVID-19 public health crisis and now face additional challenges from lost income," and concluded that only "[d]irect financial aid will help individuals and households with children to meet essential needs, including food and hygiene products." *Id.* County Executive Elrich described the program as an effort to "stabilize families that are fighting to survive" the pandemic's economic devastation. JA138.

As authorized by the County Council, the EARP Program provides a one-time payment to Montgomery County residents of $500 for single adults, $1,000 for families with one child, and $150 per additional child, up to a maximum of $1,450 per family. To qualify, residents must (1) "need financial assistance to pay for food and essentials," (2) not be eligible for federal COVID-19 stimulus checks or state benefits, and (3) have an income equal to or below 50% of the federal poverty level. JA143-144; *see* JA109. Fifty percent of the 2020 federal poverty level amounts to an annual income of $6,380 for a single-person household and $13,100 for a family of four. JA145. Recipients must submit documentation to establish their identity, residency, income, and number of children. JA144.

Under the special appropriations resolutions, funds for the EARP Program are appropriated from Montgomery County's General Fund of Undesignated Reserves to the operating budget of the County's Department of Health and Human Services ("DHHS"). JA80, 108. Revenues in the General Fund derive

from multiple sources, including fees, profits from the Department of Alcoholic Beverage Services, the local income tax, fuel energy tax, transient tax, and County property tax. JA250.

### C.    Proceedings Below

On May 11, 2020, Plaintiffs filed suit in the Circuit Court for Montgomery County. JA9-14, 18. Their complaint alleges that the EARP Program "violates 8 U.S.C. § 1621(a)." JA13. Subject to certain exceptions, that statute provides that certain noncitizens are "not eligible for any State or local public benefit," 8 U.S.C. § 1621(a), unless a "State law" enacted after August 22, 1996 "affirmatively provides" for such eligibility, *id.* § 1621(d).[2] Plaintiffs' complaint alleges that, because the EARP Program payments "are local public benefits as defined by 8 U.S.C. § 1621(c)," and the Maryland General Assembly has not enacted a statute authorizing the payment of benefits to noncitizens, the program violates 8 U.S.C. §1621(a) to the extent it affords benefits to noncitizens. JA13. Plaintiffs seek a declaration that the EARP Program violates § 1621 and an injunction prohibiting Defendants, County Executive Elrich and DHHS Director Raymond Crowel, from "providing cash payments to unlawfully present aliens." JA13-14. Plaintiffs also sought a temporary restraining order.

---

[2] This brief uses the terms "undocumented immigrants" or "noncitizens" to refer to those encompassed by § 1621(d)'s phrase "alien who is not lawfully present in the United States."

On May 13, 2020, Defendants removed the suit to the U.S. District Court for the District of Maryland, noting that "[t]he Complaint alleges a federal question (alleged violation of 8 U.S.C. § 1621)" within the court's jurisdiction under 28 U.S.C. § 1331. JA15-16; *see* 28 U.S.C. § 1441. Plaintiffs did not seek remand. The district court subsequently denied Plaintiffs' motion for a temporary restraining order on the condition that Defendants preserve at least 25% of the program funds pending further order of the court. ECF No. 34.

The district court granted summary judgment to Defendants. JA289. The court first held that it had jurisdiction under 28 U.S.C. § 1331 because "Plaintiffs' claim cannot be resolved without determining the substance of 8 U.S.C. § 1621 and whether Defendants have violated its terms." JA294. As the court noted, Plaintiffs did not seek remand or dispute the court's jurisdiction but in fact "concur[red]" in their briefing that the court had jurisdiction. *Id.*

On the merits, the court held that Plaintiffs' suit must be dismissed because Plaintiffs have no private right of action to enforce § 1621. Analyzing the statute's text and structure, the court concluded that § 1621 contains neither an express nor an implied private right of action. JA295-297. The court also rejected Plaintiffs' argument that they could enforce § 1621 based on a cause of action "found in state common law pursuant to their rights as state taxpayers." JA297. "Whether a federal statute is privately enforceable is up to Congress, not to State courts," the

9

court held, and States therefore "may not expand the scope of federal statutes beyond what Congress delineated by 'borrow[ing] entire causes of action from state law.'" JA298-299 (quoting *Moor v. Alameda Cty.*, 411 U.S. 693, 702 (1973)). The court further explained that "accept[ing] Plaintiffs' proposition that State common law provides a cause of action" to enforce § 1621 would enable "any Maryland taxpayer (or, for that matter, citizens of any State that similarly provides for general taxpayer suits) [to] … challenge any State or local official's actions based on any federal statute, irrespective of the law's relevance to the individual litigant or to whether Congress intended for the statute to be enforced through the judicial branch at all." JA299. That would draw courts into adjudicating "generalized grievances" that "Congress has not assigned [courts] to resolve." *Id.* (quotation marks omitted). The court therefore entered judgment for Defendants without considering whether the EARP Program violates § 1621 or, if so, whether that application of § 1621 would contravene the Tenth Amendment.

Plaintiffs sought an injunction pending appeal. ECF No. 49. To avoid mooting Plaintiffs' appeal, Defendants agreed to reserve $40 to $60 of the EARP Program's funds, ECF No. 50 at 1, 5-6, representing the greatest possible one-year "increase[] in [Plaintiffs'] property taxes" that the district court had suggested might occur as a result of the EARP Program, ECF No. 33 at 9. The district court accepted that arrangement, ordering "[w]ithout objection by Defendants" that

Defendants would be required to preserve $50 of the EARP funds pending appeal and otherwise denying the injunction.  ECF No. 51.

## SUMMARY OF ARGUMENT

The Court should affirm the district court's sound decision.  As Plaintiffs agreed below, the district court had subject-matter jurisdiction because Plaintiffs' claim depends on a disputed and substantial question of federal law that naturally belongs in federal court—the proper interpretation and application of § 1621.[3] *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314-315 (2005).  The absence of a federal cause of action does not foreclose federal-question jurisdiction, and Plaintiffs' contrary argument rests on a reading of *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), that the Supreme Court has repudiated.

On the merits, the district court was correct that § 1621, the sole basis for Plaintiffs' complaint, cannot be enforced by private litigants.  Plaintiffs concede that § 1621 contains no express private right of action and that it fails the Supreme Court's high bar for finding an implied private right of action.  Plaintiffs rely instead on Maryland's taxpayer-standing doctrine, but their argument fails under both state and federal law.  Maryland's taxpayer-standing rule does not, and could

---

[3] 8 U.S.C. § 1621 is reproduced in the Addendum.

not, supply a cause of action to challenge the alleged violation of a federal statute that Congress did not make privately enforceable.

The Court need go no further to affirm. But the judgment was correct for the additional reason that the EARP Program does not violate § 1621. Although § 1621(a) presumptively prohibits state and local governments from paying certain benefits to undocumented immigrants, § 1621(d) allows such payments if they are authorized "through the enactment of a State law … which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d). The EARP Program satisfies that exception. Absent a clear textual indication to the contrary, the phrase "State law" in § 1621(d) must be interpreted to include law made by a State's political subdivisions pursuant to delegated authority. *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 428-429 (2002). Section 1621 contains no such clear statement. And Montgomery County created the EARP Program pursuant to lawmaking authority delegated to it under the Maryland Constitution's home-rule provisions.

Plaintiffs' contrary interpretation of § 1621(d) tramples on States' "traditional prerogative" to allocate lawmaking power among their subdivisions as they see fit. *Ours Garage*, 536 U.S. at 429; *see Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Indeed, if § 1621 prohibited the EARP Program, that application would contravene the Tenth Amendment—both by intruding on States' sovereign

authority to structure their governments and lawmaking processes, *see Gregory*, 501 U.S. at 460, and by commandeering States' lawmaking functions to prohibit them from enacting benefits programs except in the precise manner Congress has specified (and by prohibiting States' political subdivisions from legislating such a program altogether), *see Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018).

But the Court need not reach these questions. It should hold that the district court had jurisdiction and correctly granted Defendants summary judgment for lack of a private right of action.

## STANDARD OF REVIEW

This Court "review[s] de novo issues of subject matter jurisdiction, including removal." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016). The Court reviews the grant of summary judgment de novo, applying the same standard as the district court. *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020). The Court can affirm on any basis supported by the record. *Lawson v. Union Cty. Clerk of Ct.*, 828 F.3d 239, 247 (4th Cir. 2016).

## ARGUMENT

## I. THE DISTRICT COURT HAD JURISDICTION

In seeking summary judgment, Plaintiffs agreed that the district court "ha[d] jurisdiction over Plaintiffs' state law claim" because "[t]his case presents a substantial federal question." ECF No. 29-1 at 4-6 (citing *Burrell v. Bayer Corp.*,

918 F.3d 372, 380 (4th Cir. 2019)). Having lost, Plaintiffs contend (at 1 n.1) that the district court lacked jurisdiction. Plaintiffs were correct the first time. The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' sole claim necessarily turns on a substantial question of federal law—the interpretation of § 1621 and its application to the EARP Program.

Under § 1331, federal-question jurisdiction lies either when federal law "creates the cause of action," or when the plaintiff's right to relief on a state-law claim "'necessarily depends on resolution of a substantial question of federal law.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988) (quoting *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Tr.*, 463 U.S. 1, 27-28 (1983)). The plaintiff's "well-pleaded complaint" controls the inquiry: jurisdiction is determined by the "plaintiff's statement of his own claim," without regard to anticipated defenses. *Id.* at 809; *see also Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 181 (4th Cir. 2014).

When state law furnishes a plaintiff's cause of action, federal jurisdiction exists if the claim "[1] necessarily raise[s] a stated federal issue," that is "[2] actually disputed and [3] substantial," and "[4] which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. That test "captures the commonsense notion that a federal court ought to be able to hear claims recognized

under state law that nonetheless turn on substantial questions of federal law." *Id.* at 312. A federal issue is substantial if it is "importan[t] … to the federal system as a whole." *Gunn v. Minton*, 568 U.S. 251, 260 (2013).

For example, in *City of Chicago v. International College of Surgeons*, 522 U.S. 156 (1997), the Supreme Court held that a state-court suit under Illinois's Administrative Review Law challenging permit denials by a city commission was properly removed to federal court because the complaint alleged, among other things, that the permit denials violated the plaintiff's federal constitutional rights. *Id.* at 160, 163-164. Similarly, in *Grable*, a state quiet-title action was properly removed to federal court, even though federal law provided no cause of action, because the plaintiff's right to relief depended on the meaning and application of a federal tax statute. The plaintiff could not succeed without establishing that the Internal Revenue Service had failed to give proper notice of its seizure of the contested property, as required by federal law. The "meaning of the federal statute [wa]s thus an essential element of [the plaintiff's] quiet title claim"—an "important issue of federal law that sensibly belong[ed] in a federal court." 545 U.S. at 315; *see id.* at 314-318.

Here, even accepting Plaintiffs' contention that the complaint asserts a cause of action created by state law, *Grable*'s test confirms the district court had federal-

question jurisdiction.[4] Plaintiffs concede (at 7) the first two requirements are met: their claim necessarily raises a federal question—whether the EARP Program violates § 1621—and that federal question is actually disputed.

The remaining elements are satisfied as well. Plaintiffs' contrary arguments rest on their failure to acknowledge the full scope of the disputed federal issue. Although Plaintiffs deny (at 10) that this case implicates any question of federal statutory interpretation, in fact, the proper interpretation of § 1621 is at the heart of this case. Plaintiffs have no right to relief unless they establish that the EARP Program violates § 1621, and as they concede (at 19), that issue "turns exclusively on the meaning of Section 1621(d)"—specifically, what constitutes an "enactment of State law" for purposes of that provision. That question of federal statutory construction is very much contested. Whereas Plaintiffs argue (at 25) that § 1621(d) can be satisfied only by a statute enacted by a state legislature,

---

[4] Whether Plaintiffs actually asserted a cause of action created by state law is not free from doubt. The "sole claim" in the complaint, as Plaintiffs concede (at 9), is that the EARP Program "violat[es] … federal law." The complaint invokes no provision of Maryland law that Plaintiffs seek to enforce and no basis to find Defendants' conduct unlawful other than § 1621. *See* JA11 ("legal framework" section, citing only § 1621); JA13 (sole count, alleging that the EARP Program "violates [§ 1621]" and that such "violation of federal law" caused Plaintiffs' alleged injury). The complaint can thus fairly be read as asserting a purported cause of action "create[d]" by federal law. *Christianson*, 486 U.S. at 808. On that natural reading of the complaint, the district court had federal-question jurisdiction. *Id.*

Defendants argue that § 1621(d) should be interpreted to include laws enacted by a State's political subdivisions pursuant to state-delegated authority. *See infra* pp. 33-43; ECF No. 28-2 at 15-21.

As this Court has recognized, interpretation of a federal statute is the "classic example" of a "'substantial'" federal question. *Burrell v. Bayer Corp.*, 918 F.3d 372, 385 (4th Cir. 2019). Thus, in *Grable*, removal was proper because the plaintiff's right to relief turned on "the meaning of the federal tax provision" and whether the IRS's notice was sufficient under that statute. 545 U.S. at 314-315. That question was an "important issue of federal law that sensibly belong[ed] in a federal court." *Id.* at 315. Here, too, there is a "strong" federal interest in the proper interpretation and application of § 1621, *Gunn*, 568 U.S. at 260, and thus a "serious federal interest in claiming the advantages thought to be inherent in a federal forum," *Grable*, 545 U.S. at 313; *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1569-1570 (2016) (state-law claim that the defendant "infringed a requirement of [a] federal statute" was subject to federal-question jurisdiction because its "very success depend[ed] on giving effect to a federal requirement").[5]

---

[5] The substantiality of the issue is heightened by the constitutional implications of Plaintiffs' claim. Although Plaintiffs did not raise the Tenth Amendment in their complaint, the Tenth Amendment is not just a defense in this

Moreover, exercising federal jurisdiction to determine the proper meaning and application of § 1621(d) threatens no shift in the "congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. State courts have no unique responsibility for maintaining the interpretation and application of federal statutes, *cf. Gunn*, 568 U.S. at 264, and there is no reason to think that exercising jurisdiction here would open federal courts to a flood of "garden variety state tort law" claims, *Grable*, 545 U.S. at 318. This case is far from an ordinary common-law suit. Indeed, Plaintiffs cite no state taxpayer case, apart from their own, that seeks to enforce a federal statute.

Relying on *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), Plaintiffs contend that a state-law action challenging the violation of a federal statute cannot "aris[e] under" federal law if that federal statute contains no private right of action. *See* Br. 5, 7-9 & n.3. But the plaintiff in *Grable* made the same argument, and the Supreme Court rejected it. *See* 545 U.S. at 317. The Court explained that the absence of a federal cause of action was "relevant" in *Merrell Dow* because extending federal jurisdiction over garden-variety tort claims of the sort at issue there would have "heralded a potentially enormous shift of traditionally state cases into federal courts," and the absence of a federal cause of

_____

case; it also informs the proper interpretation of § 1621, which is an essential element of Plaintiffs' claim. *See infra* pp. 43-54.

action made it improbable that Congress "would have meant to welcome" such suits. *Id.* at 318-319. But the absence of a federal cause of action was "not dispositive," and the Court reached a different result in *Grable* even though the federal law there also contained no private right of action. *Id.* *Merrell Dow* thus "cannot be read [to] … convert[] a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one." *Id.* at 317.[6]

This Court's decision in *Burrell* also lends Plaintiffs no support. In *Burrell*, this Court rejected federal jurisdiction over state-law negligence and products liability claims for which "it [wa]s clear and undisputed that the [plaintiffs could] establish all the necessary elements entirely independently of federal law." 918 F.3d at 382. Even as to the federal issues that the Court "assum[ed]" were necessarily raised by the plaintiffs' negligence and fraud claims, the Court found that those issues lacked importance to the federal system because they were "purely 'backward-looking'" and "fact-intensive" tort claims for money damages that in no way "transcend[ed] the parties" or affected government operations. *Id.* at 385-386 (quoting *Gunn*, 568 U.S. at 261). Moreover, exercising jurisdiction

---

[6] To the extent it survives *Grable*, this Court's decision in *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148 (4th Cir. 1994), is not to the contrary. *Cf.* Br. 9 n.3. Like *Merrell Dow*, that case involved ordinary tort claims in which the federal issue was not essential to the plaintiff's claim. 29 F.3d at 153-154. As Plaintiffs concede (at 19), this is not such a case, because Plaintiffs' right to relief "turns exclusively" on whether the EARP Program violates federal law.

would have risked "divert[ing] a multitude of fact-intensive, state-law suits" to federal court.  *Id.* at 387.

Here, in contrast, Plaintiffs seek to enforce a federal statute that (in Plaintiffs' own telling) relates to subject matter in which federal authority is paramount, involving significant questions of federalism and the division between state and federal authority over the extension of benefits to noncitizens.  Br. 29-30. As with federal tax law in *Grable*, "the national interest in providing a federal forum … is sufficiently substantial to support the exercise of federal-question jurisdiction over the disputed issue on removal."  *Grable*, 545 U.S. at 310.  This case thus fell comfortably within the district court's jurisdiction.[7]

## II.    PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION TO ENFORCE § 1621

On the merits, the district court correctly granted summary judgment to Defendants.  "[L]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  *Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020).  A party

---

[7] Plaintiffs appear to have alleged the minimum necessary to support Article III standing as municipal taxpayers.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006) (suggesting that "municipal residents" may have standing "to enjoin the 'illegal use of the moneys of a municipal corporation,' relying on 'the peculiar relation of the [municipal] taxpayer to the [municipality]' to distinguish such a case from the general bar on taxpayer suits" (quoting *Frothingham v. Mellon*, 262 U.S. 447, 486-487 (1923)); *Koenick v. Felton*, 190 F.3d 259, 263-264 (4th Cir. 1999) (finding standing where local taxpayer "indirectly b[ore] the burden of funding a paid public school holiday").

asserting the violation of a federal statute may therefore pursue a judicial remedy only if Congress has authorized a private right of action to enforce that statute. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The district court held—and Plaintiffs concede (at 15)—that § 1621 provides no private right of action, either expressly or implicitly. That conclusion was correct, and it mandates dismissal of Plaintiffs' complaint: Plaintiffs have no private right of action to enforce § 1621, and Maryland law does not—and cannot—fill that gap.

### A. Section 1621 Creates No Private Right Of Action

As Plaintiffs concede (at 15), the district court correctly determined that § 1621 contains no private right of action. Section 1621 does not expressly permit private parties to enforce the statute in court. Nor do the "the text and structure of" the statute show that Congress impliedly intended to permit private enforcement. *Alexander*, 532 U.S. at 288. To discern that intent, courts consider whether a statute contains "'rights-creating' language," *id.*—that is, whether the statute is "phrased in terms of the persons benefited." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692, n.13 (1979)). Courts conducting this inquiry must take a "cautious course before finding implied causes of action." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017); *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1331 (2020) (Alito, J., dissenting) (Supreme Court has "basically gotten out of the

business of recognizing private rights of action not expressly created by Congress"). Such "implicit" conferrals may be found only where a "statute … unambiguously express[es] the intent 'to create not just a private right but also a private remedy.'" *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 444 (4th Cir. 2014) (quotation marks omitted).

Section 1621 contains no "rights-creating language," *Gonzaga*, 536 U.S. at 287, or any other indication that Congress intended § 1621 to be enforced in court by private attorneys general. The statute is silent as to taxpayers or their interests. Rather, it is structured as a presumptive prohibition against state and local governments providing certain public benefits to certain "alien[s]" and addresses how those governments may offer such benefits. 8 U.S.C. § 1621(a), (d). That focus on governmental entities precludes an implied right of action. *See Alexander*, 532 U.S. at 289 (where statute is "'phrased as a directive to … agencies engaged in the distribution of public funds,'" there is "'far less reason to infer a private remedy in favor of individual persons'"). Thus, in a parallel context, the Tenth Circuit held that an adjacent statute, 8 U.S.C. § 1623, provides no private right of action against States that offer in-state tuition to noncitizens because the statute "addresses itself to the institutions affected and their authority to provide benefits to illegal aliens, not to the class of nonresident citizens who incidentally benefit from its provisions." *Day v. Bond*, 500 F.3d 1127, 1139 (10th Cir. 2007).

Similarly, § 1621 is addressed solely to States, constraining their ability to provide benefits unless they follow Congress's prescribed procedure. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 331 (2015) (no private right of action under statute "phrased as a directive to the federal agency charged with approving state Medicaid plans"). Thus, the statutory text is "twice removed from the individuals who will ultimately benefit from [the statute's] protection." *Alexander*, 532 U.S. at 289. Such "[s]tatutes that focus on the person regulated rather than the individuals protected" bear "no implication of an intent to confer rights on a particular class of persons." *Id.*

### B. Maryland Law Does Not And Cannot Supply A Cause Of Action

Although they concede that § 1621 confers no private right of action, Plaintiffs argue (at 12-14) that Maryland law supplies a cause of action that allows them to bring this suit. That is wrong as to both Maryland law and federal law. Maryland's taxpayer-standing doctrine has never been held to authorize a private suit to enforce any federal statute, let alone one that Congress did not make privately enforceable. But even if Maryland law supported Plaintiffs' position, their claim would fail because it is up to Congress, not state courts, to decide whether a federal statute is privately enforceable.

### 1. Maryland law does not authorize taxpayer suits to enforce federal statutes containing no private right of action

Maryland's taxpayer-standing doctrine permits taxpayers, under certain circumstances, to sue to enjoin state or local officials' unlawful expenditures of taxpayer funds. *Floyd v. Mayor & City Council of Baltimore*, 205 A.3d 928, 930-931 (Md. 2019). Plaintiffs assert (at 13-15) that taxpayers may also sue to enforce *federal* statutes even where Congress provided no private right of action. But Defendants have located no case in which any Maryland court extended taxpayer standing to allow a plaintiff to enforce any federal statute—much less one that Congress has not made privately enforceable. In the cases Plaintiffs cite, Maryland courts permitted plaintiffs to enforce *state or local* law without a separate cause of action. *See Floyd*, 205 A.3d at 930-931 (challenging Baltimore zoning ordinance for failure to satisfy procedural requirements); *Anne Arundel Cty. v. Bell*, 113 A.3d 639, 662-663 (Md. 2015) (challenging rezoning ordinance as illegal under state statute); *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 92 A.3d 400, 452 (Md. 2014) (challenging no-bid contract under Maryland Procurement Code); *Bennett v. Montgomery Cty.*, 2019 WL 4187399, at *7 (Md. Ct. Spec. App. Sept. 3, 2019) (claiming officials failed to conduct analysis and hold hearing as required by County code).[8]

---

[8] Plaintiffs cite two decisions holding that taxpayers had standing to challenge expenditures of state funds under federal law. *See Horace Mann League*

More fundamentally, Plaintiffs misconceive the nature of taxpayer standing in Maryland. Unlike the federal courts, Maryland courts do not always distinguish between standing and rights of action. Maryland law "groups the traditionally distinct concepts of standing and cause of action into a single analytical construct, labeled as 'standing.'" *State Ctr.*, 92 A.3d at 429-430. Thus, the Maryland Court of Appeals has explained that "taxpayer standing provides the 'cause of action' standing sufficient for justiciability." *Bell*, 113 A.3d at 661. Maryland courts analogize taxpayer suits to derivative-shareholder suits; the taxpayer is deemed to assert the right of the municipality itself under state law to prevent illegal expenditures. *State Ctr.*, 92 A.3d at 435. Once a taxpayer has "allege[d] a sufficient injury to bring suit for an illegal or *ultra vires* municipal act," she needs nothing further to obtain a judicial remedy—under Maryland law. *Id.* at 440.

Federal law is quite different: Standing and rights of action are distinct concepts. A plaintiff must have standing to proceed in federal court, and must *also* have a right of action to enforce federal law. *See Lexmark Int'l, Inc. v. Static*

---

*of U.S. of Am., Inc. v. Board. of Pub. Works*, 220 A.2d 51, 55 (Md. 1966); *Murray v. Comptroller of Treasury*, 216 A.2d 897, 902 (Md. 1966). Those cases did not involve federal statutes that Congress had not made privately enforceable. They arose under the Establishment Clause, which the Supreme Court also later recognized as a narrow basis for taxpayer standing. *See Flast v. Cohen*, 392 U.S. 83, 103 (1968). Moreover, neither case addressed the existence of a cause of action.

*Control Components, Inc.*, 572 U.S. 118, 128 (2014).  Even when a plaintiff establishes Article III standing, that does not relieve her of the requirement to demonstrate "a cause of action *under the statute*"—in other words, that the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue"—which must be analyzed under "traditional principles of statutory interpretation" concerning the existence of a private right of action.  *Lexmark*, 572 U.S. at 128 (emphasis added; citation omitted).  Even if a taxpayer faces sufficient pecuniary loss to have standing under Maryland law, it does not follow that she has a right to sue to enforce federal law—which must be furnished by Congress.

No Maryland decision even suggests that state-law taxpayer standing may be stretched to create a cause of action to enforce a federal statute that Congress did not intend to be privately enforceable.  To the contrary, the case law strongly suggests that Maryland courts would reject Plaintiffs' unprecedented extension of the doctrine.  Even with respect to suits to enforce a state statute, the Maryland Court of Appeals has recognized that "the General Assembly [can] pre-empt[] this common law right" to sue.  *State Ctr.*, 92 A.3d at 454.  In other words, Maryland law recognizes that the taxpayer-standing doctrine does not supply a cause of action if the legislature has foreclosed private enforcement.  Given the Maryland Court of Appeals' deference to the General Assembly's authority to define who may enforce a state statute, it is all the more doubtful that a Maryland court would

allow a private suit to enforce a federal law where Congress has chosen not to allow private enforcement.

> ### 2. Federal law, not state law, controls Plaintiffs' right to a judicial remedy to enforce § 1621

In any event, even if Maryland law did purport to allow this suit, it would make no difference. Plaintiffs assert (at 14) without citation that the "source of the underlying provision of law" they seek to enforce is irrelevant, but when that law is a federal statute, the source is dispositive because it is up to Congress, not the state courts, to decide whether a federal statute is privately enforceable.

Federal statutes are creatures of Congress's making, in the exercise of its enumerated powers. Thus, "private rights of action to enforce federal law must be created *by Congress*.'" *Comcast*, 140 S. Ct. at 1015 (emphasis added); *see also In re Miller*, 124 F. App'x 152, 154 (4th Cir. 2005) (same). Just as state courts may not refuse to entertain federal statutory claims that Congress has created, they may not expand the scope of liability under such federal claims beyond what Congress has delineated—including by "borrow[ing] entire causes of action from state law." *Moor v. Alameda Cty.*, 411 U.S. 693, 701 (1973).

In *Moor*, the Supreme Court rejected an effort to borrow state law to extend liability under 42 U.S.C. § 1983 to a municipal defendant. Although state law had waived municipal immunity from suit, the Supreme Court held that state law could not expand the remedies available under § 1983, which at that time had been

construed to exclude municipal liability.  *See Moor*, 411 U.S. at 699-700.[9]  Indeed, the Court reached that conclusion even though Congress had expressly provided that § 1983 should be "enforced in conformity with … the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil ... cause is held," 42 U.S.C. § 1988, explaining that Congress nonetheless had not "authorize[d] the wholesale importation into federal law of state causes of action—not even one purportedly designed for the protection of federal civil rights," *Moor*, 411 U.S. at 699-704.

As the district court explained, allowing States to create state-law causes of action to expand federal statutory remedies would subvert Congress's careful determinations concerning the enforceability of federal law, significantly upsetting the balance of federal and state power and potentially flooding courts with private lawsuits to enforce federal statutes that Congress intended to be enforced only by the federal government.  Moreover, because States recognize taxpayer standing to differing degrees, it would also yield an inconsistent patchwork that would thwart the uniform application of federal law.  *See Berry v. City of Muskogee*, 900 F.2d

---

[9] The Court later overruled its holding that municipalities cannot be liable under § 1983, *see Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978), but *Moor* remains good law.  *See Howlett v. Rose*, 496 U.S. 356, 376 (1990) (under *Moor*, "[a] State may not, by statute or common law, create a cause of action under § 1983 against an entity whom Congress has not subjected to liability").

1489, 1506 (10th Cir. 1990) (declining to "permit[] the state to define the scope and extent of recovery" under § 1983 by allowing Oklahoma wrongful death action, which would allow remedies not available under other States' laws); *Jaco v. Bloechle*, 739 F.2d 239, 243 n.5 (6th Cir. 1984) (Ohio's wrongful death statute could not "create[] a cause of action" to enforce § 1983).

The existence and scope of a private right of action to enforce a federal statute are matters for Congress, no less than the substantive scope of that statute. And where Congress has elected not to authorize private suits to enforce a federal statute, state courts are not free to displace that choice. The cause of action Plaintiffs purport to assert under Maryland law—even if Maryland authority supported it—would alter the federal statute by creating a right to a judicial remedy that does not exist under § 1621, in violation of the Supremacy Clause. *See In re Commonwealth's Mot. to Appoint Counsel¸* 790 F.3d 457, 475-477 (3d Cir. 2015) (purported state-law cause of action to enforce federal statute was preempted where Congress did not provide for private enforcement, as such enforcement would "interfere with" Congress's chosen regulatory scheme); *cf. Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 118 (2011) (permitting county to enforce federal

1489, 1506 (10th Cir. 1990) (declining to "permit[] the state to define the scope and extent of recovery" under § 1983 by allowing Oklahoma wrongful death action, which would allow remedies not available under other States' laws); *Jaco v. Bloechle*, 739 F.2d 239, 243 n.5 (6th Cir. 1984) (Ohio's wrongful death statute could not "create[] a cause of action" to enforce § 1983).

The existence and scope of a private right of action to enforce a federal statute are matters for Congress, no less than the substantive scope of that statute. And where Congress has elected not to authorize private suits to enforce a federal statute, state courts are not free to displace that choice. The cause of action Plaintiffs purport to assert under Maryland law—even if Maryland authority supported it—would alter the federal statute by creating a right to a judicial remedy that does not exist under § 1621, in violation of the Supremacy Clause. *See In re Commonwealth's Mot. to Appoint Counsel¸* 790 F.3d 457, 475-477 (3d Cir. 2015) (purported state-law cause of action to enforce federal statute was preempted where Congress did not provide for private enforcement, as such enforcement would "interfere with" Congress's chosen regulatory scheme); *cf. Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 118 (2011) (permitting county to enforce federal

statute through third-party contract beneficiary theory would "render[] meaningless" the "absence of a private right [of action]" under the statute).[10]

Plaintiffs cite decisions involving substantive state-law claims that referenced the defendant's violation of a federal law. In *Clark v. Velsicol Chem. Corp.*, 944 F.2d 196, 197 (4th Cir. 1991), for example, the plaintiff claimed the defendant was liable for negligence under North Carolina law for packaging and labeling that violated federal regulations. *See also Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 814 (4th Cir. 2004) (addressing claim that defendant "unlawfully terminated [the plaintiff's] employment in violation of South Carolina law" by violating plaintiff's First Amendment rights); *Mulcahey, v. Columbia Organic Chems. Co.*, 29 F.3d 148, 152-153 (4th Cir. 1994) (considering state-law negligence claim predicated on violation of federal environmental statutes). But none of those cases holds that a state court can create a private right of action to enforce a federal statute that Congress has not made privately enforceable— indeed, contrary to Plaintiffs' contention (at 15-16), those cases do not address the

---

[10] It is thus irrelevant that Plaintiffs did not sue originally in federal court. Br. 15. Whether a private plaintiff can obtain a judicial remedy to enforce a federal statute is a question of federal law, and the answer would have been the same in the state court as in federal court. *See Astra USA*, 563 U.S. at 118*; see also, e.g., Yuan v. Johns Hopkins Univ.*, 135 A.3d 519, 532 (Md. Ct. Spec. App. 2016), *aff'd*, 157 A.3d 254 (Md. 2017) (recognizing that *Alexander* governs private enforceability of federal statute).

validity of the causes of action at issue at all.[11] Rather, those cases simply illustrate that state law may create substantive causes of action—*e.g.*, for violations of state employment or consumer-protection law or state common-law duties—that refer to or incorporate some element of federal law to establish a violation of state law. *See Burrell*, 918 F.3d at 382-383 (considering state-law negligence and other tort claims predicated on violations of federal law).

Here, however, Plaintiffs' claim does not incorporate federal law as an element of a substantive state-law cause of action for which a remedy is otherwise available. Plaintiffs do not allege that Defendants violated any Maryland statutory or common-law duty. They allege only that Defendants "violate[d] § 1621," JA13, and their purported state-law cause of action is no more than an empty vehicle for bringing that federal statutory claim—"an impermissible 'end run'" around Congress's decision not to afford a private right of action under § 1621.

---

[11] The cases instead considered federal-question jurisdiction without addressing the validity or scope of the cause of action. *See Mulcahey*, 29 F.3d at 153 (no jurisdiction because federal issues were not essential to plaintiff's claim); *Clark*, 944 F.2d at 198-199 (holding, before *Grable*, that lack of federal cause of action precluded jurisdiction under *Merrell Dow*); *Dixon*, 369 F.3d at 818-819 (rejecting jurisdiction where claim did not depend on a substantial question of federal law). To the extent Plaintiffs cite these cases to argue that the district court should have remanded to state court for lack of jurisdiction rather than dismissing their case on the merits, Plaintiffs ignore *Grable*, and they ignore that the absence of a cause of action does not deprive the court of jurisdiction. *See Bell v. Hood*, 327 U.S. 678, 682 (1946) ("[T]he failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").

*Grochowski v. Phoenix Constr.*, 318 F.3d 80, 85-86 (2d Cir. 2003); *see also*

*Johnson v. System Connection of Md., Inc.*, 2016 WL 4124214, at *3 (D. Md. Aug.

2, 2016) (citing several cases "reject[ing] attempts … [to] cloak[] inherently

[federal-law] claims in the garb of state law").

Accepting Plaintiffs' position would be even more disruptive than simply

subverting congressional intent regarding the enforceability of federal statutes.

Private rights of action generally permit "a discrete class of persons" to vindicate a

clear statutory interest and remedy a personalized injury. *See Planned Parenthood

S. Atl. v. Baker*, 941 F.3d 687, 697 (4th Cir. 2019), *cert. petition filed*, No. 19-1186

(U.S. Mar. 27, 2020). But Plaintiffs interpret Congress's silence in § 1621 as

allowing all taxpayers in States that recognize taxpayer standing to enforce that

statute's regulation of state and local governments in court. Such broad rights of

action for generalized grievances are particularly disfavored. *See, e.g.*, *Jefferies v.

District of Columbia*, 917 F. Supp. 2d 10, 57 (D.D.C. 2013) ("There is generally no

private right of action for individual taxpayers who disagree with how agencies

spend money, or those who claim to be harmed by a 'misuse' or 'waste' of

funds."). And such a right of action would raise serious Article III questions, as it

could purport to enable litigants who have suffered no tangible injury at all to

challenge alleged violations by state or local actors who disbursed benefits to

noncitizens without satisfying § 1621's procedural requirements. *Cf. Spokeo, Inc.*

*v Robins*, 136 S. Ct. 1540, 1549 (2016) (underscoring Article III limits against statutory claims that "allege a bare procedural violation, divorced from any concrete harm").

Plaintiffs' case therefore fails at the threshold because they have no right of action to enforce § 1621.  This Court should affirm on that basis and need not proceed further.

## III.  THE EARP PROGRAM COMPLIES WITH § 1621

Although it is unnecessary to reach the issue, this Court could alternatively affirm on the ground that the EARP Program does not violate § 1621.  That statute does not categorically forbid States and local governments from providing monetary benefits to undocumented immigrants.  Instead, it requires such benefits to be disbursed pursuant to "the enactment of a State law after August 22, 1996, which affirmatively provides for [noncitizens'] eligibility."  8 U.S.C. § 1621(d).  That provision is best interpreted to include laws enacted by a State's political subdivisions pursuant to state-delegated authority.  The enactments authorizing and funding the EARP Program readily meet that definition.

### A.  Section 1621(d)'s Reference To "State Law" Includes Laws Enacted By State Subdivisions Pursuant To State-Delegated Lawmaking Authority

Section 1621(d) does not define the terms "State" or "State law," nor does any other provision in the statutory scheme.  *See* Pub. L. No. 104-193, 110 Stat.

2260 (1996). Plaintiffs nonetheless contend that "State law" must refer solely to statutory "enactments of a state legislature." Br. 24; *see id.* at 10 (arguing the EARP Program is unlawful because "the Maryland legislature has not affirmatively authorized" it). But Supreme Court authority that Plaintiffs ignore holds that statutory references to a "State" should ordinarily be interpreted to encompass a State's political subdivisions. *Ours Garage*, 536 U.S. at 428-429. In particular, "[a]bsent a clear statement to the contrary, Congress' reference to the 'regulatory authority of a State' should be read to preserve, not preempt the traditional prerogative of the States to delegate their authority to their constituent parts." *Id.* at 429.

Requiring Congress to say so clearly when it intends "State law" to exclude laws enacted by a State's political subdivisions enforces the background rule that States have "absolute discretion" to create "local governmental units … as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-608 (1991) (quotation marks omitted). Indeed, as discussed below, that requirement is particularly critical where, as here, interpreting a statute to prohibit a State from delegating legislative authority to its political subdivisions would raise grave constitutional concerns. *See infra* pp. 43-54; *Gregory*, 501 U.S. at 460; *Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2004) (absent the "plain

statement *Gregory* requires," "federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power").

Given that principle, courts consistently treat "State law" as including laws made by political subdivisions pursuant to state authorization. For instance, it is "axiomatic that 'for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.'" *Mortier*, 501 U.S. at 605 (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)); *see also, e.g.*, *City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002) (describing preemption inquiry as "whether *state action, in the form of the City's resolution*, interferes with or is contrary to the laws of Congress, made in pursuance of the Constitution" (emphasis added)). And in the municipal liability context, this Court has recognized that "state law (*which may include valid local ordinances and regulations*) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Dotson v. Chester*, 937 F.2d 920, 924 (4th Cir. 1991) (emphasis added) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)); *see also, e.g.*, *Davison v. Randall*, 912 F.3d 666, 681 (4th Cir. 2019) (county officer acted "under color of state law").

Plaintiffs identify no clear statement in § 1621(d) excluding States' political subdivisions from that provision's reference to an "enactment of a State law." Plaintiffs instead contend (at 22) that Congress "could have easily inserted 'local' 'or political subdivision'" into § 1621(d) had it meant to include them. But this gets the relevant interpretive principle backwards. No clear statement is required to *include* political subdivisions. Congress must speak clearly to *exclude* them. *Ours Garage*, 536 U.S. at 428-429.

Plaintiffs seek (at 23-24) to infer that clear statement from other sections of Title 8 in which Congress used the phrase "State or political subdivision." But the same inference could have been drawn in *Ours Garage*. The provision at issue there referred only to the "authority of the State," whereas another section of the same statute used the words "State [or] political subdivision of a State." 536 U.S. at 431. The Supreme Court nonetheless construed "authority of the State" to include laws made by political subdivisions—notwithstanding the neighboring provision—to avoid undermining state authority. *Id.* at 429; *see also id.* at 439-440 ("[F]ederal courts should resist attribution to Congress of a design to disturb a State's decision on the division of authority between the State's central and local units over [issues of local concern].").

The inference on which Plaintiffs rely thus cannot supply the clear statement necessary to overturn the fundamental presumption that States have complete

discretion to delegate their lawmaking authority to political subdivisions. For Congress to interfere in the way a State allocates its internal lawmaking functions would be a grave matter, and the Court should not reach that conclusion absent an unmistakable showing that Congress has done so. *Cf. Mortier*, 501 U.S. at 607 ("Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority.").

Here, no such showing is possible. The other provisions on which Plaintiffs rely merely acknowledge that both States and their subdivisions might administer certain benefits programs; they do not speak to the division of authority between States and their subdivisions. For example, 8 U.S.C. § 1624(a) authorizes a "State or political subdivision of a State" to "prohibit or otherwise limit or restrict the eligibility of aliens or classes of aliens for programs of general cash public assistance furnished under the law of the State or a political subdivision of a State." But that provision simply allows States and their political subdivisions to add further eligibility restrictions on top of § 1621(a)'s exclusions to existing state or local benefits programs. It says nothing about which entities may enact "State law" rendering excluded noncitizens eligible under § 1621(d). Likewise, § 1625 allows a "State or political subdivision of a State" to "require an applicant for State and local public benefits (as defined in section 1621(c)) to provide proof of eligibility." *Id.* § 1625. Like § 1624, § 1625 permits state and local governments

to demand proof of eligibility when administering existing state or local benefits programs as contemplated by § 1621(a) and (c), and has no bearing on the definition of "State law" under § 1621(d). If anything, § 1625's cross-reference to § 1621 indicates that Congress expected that local governments already operate their own benefits programs and could make law respecting those programs.

Nor is the legislative history dispositive. As this Court has admonished, "'[t]he text of the statute, and not the private intent of the legislators, is the law.'" *Kofa v. INS*, 60 F.3d 1084, 1088 (4th Cir. 1995). If Congress had intended to disrupt States' sovereign prerogative to delegate lawmaking authority to their political subdivisions, it was required to say so clearly, in the statute. *Ours Garage*, 536 U.S. at 428-429. It did not. This Court should thus construe Congress's reference to "State law" to preserve that sovereign authority. Nothing in § 1621 unambiguously forecloses that reading, and Plaintiffs' alternative would raise grave constitutional questions under the Tenth Amendment. *Infra* pp. 43-54.

### B. Montgomery County Enacted The EARP Program Pursuant To A Delegation Of The State's Legislative Power

Under a proper interpretation of § 1621(d), the appropriation measures enacting the EARP Program satisfy that provision's exception for an enactment of "State law" providing for benefits to undocumented immigrants. Through the Maryland Constitution's "Home Rule Amendment," Maryland has established charter counties like Montgomery County as political subdivisions with state-

delegated authority to make "State law" as § 1621(d) uses that term, and Montgomery County exercised that authority in adopting the EARP Program.

Before the Home Rule Amendment, Maryland's General Assembly governed locally by enacting state laws addressed to the specific needs of specific areas in the State. *See State v. Stewart*, 137 A. 39, 40-41 (Md. 1927). The Home Rule Amendment transferred that function to charter counties, amending the Maryland Constitution to provide that where a county has formed a charter, "[t]he General Assembly shall by public general law provide a grant of express powers for such County or Counties." Md. Const. art. XI-A, § 2. Consistent with that mandate, the Maryland General Assembly passed the Express Powers Act, which amended the Maryland Code to provide that in charter counties, a "county council may pass any ordinance, resolution, or bylaw not inconsistent with State law that … may aid in maintaining the peace, good government, health, and welfare of the county." Md. Code Ann., Local Gov't § 10-206. Thus, charter counties enjoy the "self-determination" of home rule—*i.e.*, the authority to enact locally applicable measures to maintain the welfare of county residents. 6 Larsen, *Md. Law Encyclopedia Counties* § 10 (2020).

At the same time, the Home Rule Amendment limited the General Assembly's authority to enact local laws, providing that the General Assembly shall enact no public local law "on any subject covered by the express powers"

granted to charter counties. Md. Const. art. XI-A, § 4. Maryland has thus expressly transferred to charter counties, like Montgomery County, authority to exercise certain lawmaking functions that were once performed by the General Assembly. As the Maryland Court of Appeals has explained, "the purpose of home rule was to *share the legislative power* with the counties," *County Council v. Investors Funding Corp.*, 312 A.2d 225, 234 (Md. 1972) (emphasis added)—a choice that should be respected in interpreting and applying § 1621(d).

Plaintiffs contend (at 20-22) that the Montgomery County Council can enact only "local laws," not "State law." It is true that Montgomery County makes "local" laws, in the sense that its laws pertain only to Montgomery County—the County cannot govern the City of Baltimore, for example. But a law's geographic sweep does not determine whether it constitutes "State law" within the meaning of § 1621(d). Plaintiffs assume that a "State law" under § 1621(d) can only be one that "deals with the general public welfare, a subject which is of significant interest not just to any one county," and is not "confined in its operation to prescribed territorial limits." Br. 21 n.4 (quoting *Steimel v. Board of Election Supervisors*, 357 A.2d 386, 388 (Md. 1976)). But nothing in § 1621(d) supports that assumption, and neither does the Maryland authority Plaintiffs cite.

*Steimel* addressed Maryland law's distinction between a "public general law" and a "public local law." 357 A.2d at 388. Contrary to Plaintiffs' suggestion,

the court did not equate "state law" with "public general law" or contrast it with "public local law." Plaintiffs have supplied those definitions themselves (at 21 n.4), but Maryland law is to the contrary: Both public general laws and public local laws are "state laws" enacted by the General Assembly. *See Steimel*, 357 A.2d at 387 (considering whether an enactment of the General Assembly was a "public general law" or a "public local law").

Thus, if geographic scope were the test, then even some "enactment[s] by [Maryland's] state legislature" would not qualify as "State law"—a result even Plaintiffs would presumably reject. Br. 25 ("State law" means "an enactment by a state legislature"). Before the Home Rule Amendment, the General Assembly routinely enacted laws that applied only in specific areas. *See, e.g.*, Mont. Cty. Code 1965, ch. 49, art. I, § 49-5 (modifying 1912 Md. Laws, ch. 790, § 464). Although those laws were "local" in the geographic sense, they constituted and carried the force of state law as enactments of the General Assembly. The Home Rule Amendment and implementing legislation transferred the legislature's authority to make precisely such laws to Maryland's charter counties, which now exercise that "portion of state power" to make locally applicable state law that "the

State, under its own constitution and laws, ch[ose] to delegate" to them. *Ours Garage*, 536 U.S. at 428-429.[12]

That the General Assembly has authority to preempt some county laws does not alter the analysis. *Cf.* Br. 22 n.5. In the Home Rule Amendment and Express Powers Act, the General Assembly granted charter counties the power to enact public local laws, while retaining exclusive power to enact public general laws. As to some subjects, counties' power to enact public local law is exclusive, while on other subjects, the counties share authority concurrently with the General Assembly. *See* Md. Code, Local Gov't, §§ 10-202, 10-206. The Home Rule Amendment's conflict-of-laws provision—providing that where a county-enacted public local law conflicts with state legislation, the General Assembly's law controls, Md. Const. art. XI-A, § 3—does not alter the character of the county enactment as law made pursuant to a delegation of the legislature's lawmaking authority, but merely clarifies which provision controls if two come into conflict. And here, there is no conflict.

---

[12] Even after the Home Rule Amendment, the General Assembly can still enact "local" laws on certain subjects, which are plainly "State law" under § 1621(d). *E.g.*, H.B. 805, 2020 Md. Laws, ch. 331 (May 8, 2020) (exempting property in Montgomery County from certain permit requirements); H.B. 546, 2020 Md. Laws, ch. 245 (May 8, 2020) (requiring members of Anne Arundel County's Board of Community College Trustees to reside in the county).

Accordingly, through the Home Rule Amendment and Express Powers Act, Maryland exercised its sovereign prerogative to allocate to its charter counties certain lawmaking authority once exercised by the General Assembly. Section 1621(d) should be construed to respect that choice. Under a proper interpretation of § 1621(d), laws enacted by a Maryland charter county in the exercise of that delegated authority—including the EARP Program—satisfy the exception in § 1621(d), and the EARP Program is therefore lawful.[13]

## IV. APPLYING § 1621 TO INVALIDATE THE EARP PROGRAM WOULD VIOLATE THE TENTH AMENDMENT

Plaintiffs would construe § 1621 to prohibit States from disbursing benefits to noncitizens unless the State does so in accordance with Congress's particular mandates, and to prohibit States' political subdivisions from doing so at all. If § 1621 in fact applied in that manner to invalidate the EARP Program, it would violate the constitutional principles of federalism expressed in the Tenth Amendment by dictating how States may structure and exercise governmental power, *see Gregory*, 501 U.S. at 460, and by commandeering States and their subdivisions, legislating what they may and may not do and demanding that they

---

[13] Plaintiffs do not dispute that the appropriations resolutions authorizing the EARP Program were "enactment[s]" that "affirmatively provide[]" for undocumented immigrants' eligibility for benefits. They have therefore waived any argument that those requirements were not met. *McBurney v. Young*, 667 F.3d 454, 470 (4th Cir. 2012).

"govern according to Congress's instructions." *New York v. United States*, 505 U.S. 144, 162 (1992); *see Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018).

The Court need not reach these issues. But if the Court were to conclude that Plaintiffs have a private right of action to enforce § 1621 and that the EARP Program violates that statute, the Court should nonetheless affirm the judgment on Tenth Amendment grounds.

### A. Under Plaintiffs' Reading, § 1621 Would Impermissibly Interfere With The Structure And Functions Of State Governments

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided," a court's "duty is to adopt the latter." *Jones v. United States*, 529 U.S. 848, 857 (2000). Plaintiffs' reading of § 1621 raises "grave" constitutional questions indeed: As Plaintiffs read it (at 19-28), § 1621(d) provides that only a state legislature may exercise lawmaking authority that many States, including Maryland, have determined may be exercised by their political subdivisions. *Supra* pp. 38-43. Congress lacks authority to restructure the exercise of state lawmaking power in this way.

Determining who may exercise state authority and how is "a decision of the most fundamental sort for a sovereign entity." *Gregory*, 501 U.S. at 460. As the Supreme Court has explained, it is "[t]hrough the structure of its government, and the character of those who exercise government authority, [that] a State defines

itself as a sovereign." *Id*. The way a State allocates lawmaking authority "go[es] to the heart of representative government," *id.* at 461; "[i]f Congress could displace a State's allocation of governmental power and responsibility," then a State's own branches of government could be compelled to act outside the powers granted to them by the State's constitution, *Alden v. Maine*, 527 U.S. 706, 752 (1999). "A State," in other words, "is entitled to order the processes of its own govern[ment]." *Id.*; *accord Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015) ("States retain autonomy to establish their own governmental processes."); *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937) ("How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself."). That principle protects a State's decision to authorize agencies or subdivisions to exercise the power of the State. *Cf. District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 108 (1953) ("There is no reason why a state, if it so chooses, may not fashion its basic law so as to grant home rule or self-government to its municipal corporations.").

Under Plaintiffs' reading, § 1621 tramples on this fundamental aspect of state sovereignty. Maryland has determined that its charter counties—being uniquely accountable to the public and receptive to local needs—should be able to exercise the legislative power of the State as to certain subjects except where

45

prohibited by state law. *See supra* pp. 38-43; *Edwards Sys. Tech. v. Corbin*, 841 A.2d 845, 851 (Md. 2004) (explaining that Maryland adopted home rule "to achieve a significant degree of political self-determination"). "Congressional interference with this decision … would upset the usual constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. Yet according to Plaintiffs, § 1621 permanently alters the ordinary allocation of authority in "home rule" States over matters of public benefits, effectively nullifying state constitutional provisions that allow political subdivisions, rather than the state legislature, to control how to spend municipal dollars to address local concerns. Plaintiffs cite no case establishing that Congress has such power.

Indeed, the only other court to have addressed a constitutional challenge to § 1621 held it unconstitutional on precisely these grounds. In *In re Vargas*, 10 N.Y.S.3d 579 (App. Div. 2015), a New York court considered whether § 1621 barred an undocumented graduate of a state law school from obtaining a law license. *Id.* at 582-584. The court concluded that the congressional mandate that States use only the lawmaking procedures specified in § 1621(d), as the court read it, violated the Tenth Amendment "by prescribing … the method by which individual states can exercise the right to opt out of" the federal regime. *Id.* at 594. "The … right[] of the states to structure their governmental decision-making processes as they see fit," the court explained, "is essential to the sovereignty

protected by the Tenth Amendment." *Id.* Section 1621(d), the court held, violated that aspect of state sovereignty by prescribing the method by which the States can exercise their own authority. *Id.* at 595.

This Court need not reach these "grave and doubtful constitutional questions," *Jones*, 529 U.S. at 857, if it construes § 1621(d) to defer to States' own decisions about how to enact "State law." *See supra* pp. 33-38. If, however, the Court accepts Plaintiffs' view of the statute, then § 1621 would be unconstitutional to the extent it prohibits States from extending benefits to undocumented persons without using congressionally mandated lawmaking processes.

## B.  Applying § 1621 To Invalidate The EARP Program Would Violate The Anti-Commandeering Principle

The Tenth Amendment anticommandeering doctrine reflects the basic principle that Congress may not "require the States to govern according to [its] instructions." *New York*, 505 U.S. at 162. This principle traces to a structural choice made by the Founders to establish "a Constitution in which Congress would exercise its legislative authority directly over individuals rather than over States." *Id.* at 165; *Murphy*, 138 S. Ct. at 1475. As a consequence, "even where Congress has authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at 166; *see also id.* ("[T]he Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not

authorize Congress to regulate state governments' regulation of interstate commerce."). "Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Murphy*, 138 S. Ct. at 1477. The same is true of efforts to regulate a State's "political subdivisions"; a statute regulating such an entity is "incompatible with our constitutional system of dual sovereignty." *Printz v. United States*, 521 U.S. 898, 935 (1997).

Applying § 1621 to strike down the EARP Program would flout this basic constitutional rule. Section 1621 does not regulate immigration or noncitizens directly; it instead purports to regulate States' enactment and administration of their benefits programs. Under Plaintiffs' view of the statute, States may not confer certain public benefits on undocumented persons unless they allocate and exercise their lawmaking authority in precisely the manner Congress has dictated. And States' political subdivisions may *never* confer such benefits. Congress has no authority to "issue direct orders to the … States" in this manner. *Murphy*, 138 S. Ct. at 1476. Federal legislation dictating what a State "may and may not do" is a "direct affront to state sovereignty." *Id.* at 1478. Yet § 1621 requires States to govern according to Congress's instructions, prohibiting States from enacting a benefits program that aids undocumented immigrants unless the State complies with Congress's mandates—"as if federal officers were installed in state legislative

chambers and were armed with the authority to stop legislators from voting" on any proposal that did not satisfy the terms of the federal statute, *id.*—and prohibiting counties from enacting such a program at all. Indeed, whereas the law struck down in *Murphy* simply restricted States' regulation of private conduct, § 1621 restricts whether and how state and local governments can expend their own funds to address local needs—striking at the core of state sovereignty.

## C.     Plaintiffs' Arguments Lack Merit

Plaintiffs contest few of these principles. They do not dispute that *Gregory* condemns federal efforts to interfere with "the structure of [state] government, and the character of those who exercise government authority" in a State, *see* 501 U.S. at 460; indeed, they do not cite *Gregory* at all. Nor do they dispute that the federal government cannot "issue direct orders to the … States." *Murphy*, 138 S. Ct. at 1476. Instead, Plaintiffs posit (at 28-34) that these principles do not apply because Congress enacted § 1621 pursuant to its exclusive power to regulate immigration, over which States retain no authority. That argument fails on multiple levels.

As an initial matter, § 1621 was not enacted pursuant to any "exclusive" authority Congress possesses to regulate immigration. Congress's immigration authority is exclusive only over matters at the core of its power to adopt "uniform Rule[s] of Naturalization," U.S. Const. art. I, § 8, cl. 4—*i.e.*, to determine "who should or should not be admitted into the country, and the conditions under which

a legal entrant may remain," *DeCanas v. Bica*, 424 U.S. 351, 355 (1976).

Congress enjoys no "exclusive" authority over the provision of public benefits to

noncitizens, as *DeCanas* confirms.

   *DeCanas* involved a California law regulating the employment of

undocumented immigrants. Like Plaintiffs here, the respondents argued that

regulating noncitizens' employment was within Congress's "exclusive" authority

over immigration, such that state regulation on the subject was preempted.

Respondents. Br., *DeCanas v. Bica*, No. 74-882, 1975 WL 173815, at *2-3 (U.S.

Sept. 19, 1975). But the Supreme Court rejected that argument, explaining that

"regulation of aliens" is not the same as "regulation of immigration." *DeCanas*,

424 U.S. at 355. "[I]f all state regulation of aliens was ipso facto regulation of

immigration," the Court explained, most of its immigration-preemption case law

would have been unnecessary. *Id.* Instead, "even if such local regulation has some

purely speculative and indirect impact on immigration, it does not thereby become

a constitutionally prescribed regulation of immigration." *Id.* at 355-356.

   States thus retain authority to regulate certain conditions under which

employers may hire undocumented persons, *see Chamber of Commerce of U.S. v.

Whiting*, 563 U.S. 582, 587-588 (2011); *DeCanas*, 424 U.S. at 356; to establish

citizenship qualifications for certain public positions, *see Bernal v. Fainter*, 467

U.S. 216, 220 (1984); and, under some circumstances, to authorize State officers to

check the immigration status of noncitizens, *see Arizona v. United States*, 567 U.S. 387, 412-413 (2012). The EARP Program similarly falls outside the narrow scope of Congress's exclusive authority over immigration. Indeed, the subject matter of § 1621—a State's determination of who may receive benefits from the State's own fisc and when—is an area in which state and local authority, not federal authority, is at its apogee, *see Dandridge v. Williams*, 397 U.S. 471, 485-486 (1970). States retain that authority unless it is preempted by a valid federal law that "regulates the conduct of private actors, not the States." *Murphy*, 138 S. Ct. at 1481.[14]

In any event, the source of Congress's enumerated authority to legislate is irrelevant to the Tenth Amendment analysis. The principles of federalism reflected in cases like *Gregory* and *New York* do not depend on the particular grant of authority in Article I under which Congress has purported to legislate; rather, they are structural limitations on congressional power, reflected in the Tenth

---

[14] Following *DeCanas*, courts have generally rejected arguments that regulating noncitizens' eligibility for benefits falls within Congress's "exclusive" authority over immigration. *See Keller v. City of Fremont*, 719 F.3d 931, 940-942 (8th Cir. 2013) (regulation of housing for noncitizens "do[es] not regulate immigration generally or conduct in the 'field' of alien removal"); *LeClerc v. Webb*, 419 F.3d 405, 423 (5th Cir. 2005) (similar with respect to regulation of bar admissions). *Korab v. Fink*, 797 F.3d 572 (9th Cir. 2014), is not to the contrary. *Cf.* Br. 30. *Korab* merely discusses the legislative findings Congress made in enacting § 1621, some of which concern the regulation of noncitizens. *See* 797 F.3d at 580-581. It does not hold or even imply that the provision of benefits to noncitizens is an area of "exclusive" congressional authority.

Amendment, that apply regardless of which Article I power Congress happened to invoke.

The Supreme Court made exactly this point in *New York*, explaining that "Congress exercises its conferred powers subject to the limitations contained in the Constitution." *New York*, 505 U.S. at 156. "Thus, for example, under the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment." *Id.* The principles of federalism explicated in cases like *Gregory* and *New York*, the Court explained, are analogous insofar as they impose limitations on congressional authority even where Congress purports to act pursuant to an enumerated power. *See id.* at 166-167; *see also Murphy*, 138 S. Ct. at 1476 ("The anticommandeering doctrine simply represents the recognition of this limit on congressional authority."); *Printz*, 521 U.S. at 923-924. The Supreme Court has made the same point in the context of the limitations imposed by the Eleventh Amendment on Congress's authority to abrogate state sovereign immunity. Those limits apply regardless of which Article I power Congress has invoked. *See Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 636 (1999) ("Congress may not abrogate state sovereign immunity pursuant to its Article I powers" regardless of which enumerated authority it invokes); *Allen v. Cooper*, 140 S. Ct. 994, 1001 (2020) (same). It is

thus irrelevant whether Congress legislates pursuant to its authority over

immigration, its Commerce Clause authority, or any other authority enumerated in

Article I; the same constitutional limitations apply under the Tenth Amendment.[15]

Plaintiffs respond that § 1621 "does not mandate any action by the States" in

violation of the Tenth Amendment but merely imposes restrictions on noncitizens,

insofar as it "inform[s] [them] that they are not eligible for specific types of

benefits."  Br. 32-33.  But the statute in *Murphy*, too, had the purpose and effect of

precluding individuals from engaging in certain conduct (there, gambling)—or, in

Plaintiffs' words, "inform[ing]" people that they were not allowed to gamble.  *See*

*Murphy*, 138 S. Ct. at 1481.  The Court nonetheless invalidated the statute on

anticommandeering grounds, explaining that a federal statute can be justified as a

"regulation of private actors" (and thus a valid preemption statute) only if it

imposes a direct prohibition on those private actors—in the Court's words, if the

---

[15] Indeed, courts have not hesitated to apply Tenth Amendment principles in
cases touching on immigration.  *See United States v. California*, 921 F.3d 865,
888-891 (9th Cir. 2019) (upholding state statute limiting state and local
cooperation with immigration enforcement in part on ground that the Tenth
Amendment allows States to "refrain from participation" in federal programs); *City
of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018) (holding that
federal statute prohibiting States and municipalities from barring the sharing of
immigration-related information with the federal government violated the Tenth
Amendment), *aff'd on other grounds sub nom. Chicago v. Barr*, 961 F.3d 882 (7th
Cir. 2020); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329-331 (E.D.
Pa. 2018) (same), *aff'd on other grounds*, 916 F.3d 276 (3d Cir. 2019).

statute "would … be violated" if private parties acted in a manner prohibited by Congress. *Id.* Section 1621 does not impose any penalties on noncitizens for receiving benefits; therefore, it cannot be understood as a "regulation of private actors." *Id.* Indeed, if § 1621 regulates noncitizens, rather than States and municipalities, then Plaintiffs have sued the wrong defendants.

Plaintiffs thus offer no persuasive response to the Tenth Amendment concerns their suit raises. The Court need not reach these issues. But if it becomes necessary to do so, the Court should hold that § 1621, if applied to invalidate the EARP Program, violates the Tenth Amendment.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

/s/ *Paul R.Q. Wolfson*

| | |
|---|---|
| PAUL R.Q. WOLFSON | MARC P. HANSEN |
| CATHERINE M.A. CARROLL | County Attorney |
| LEON T. KENWORTHY | JOHN P. MARKOVS |
| ALEX HEMMER | Deputy County Attorney |
| ALEXANDRA STEWART | 101 Monroe Street, Third Floor |
| WILMER CUTLER PICKERING | Rockville, MD 20850 |
| HALE AND DORR LLP | (240) 777-6700 |
| 1875 Pennsylvania Avenue NW | marc.hanson@montgomerycounty.gov |
| Washington, DC 20006 | |
| (202) 663-6000 | |
| paul.wolfson@wilmerhale.com | |

September 9, 2020

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,988 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ *Paul R.Q. Wolfson*
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
(202) 663-6000

September 9, 2020

# ADDENDUM

# ADDENDUM
## TABLE OF CONTENTS

Page

8 U.S.C. § 1621 ........................................................................................Add. 1

*DeCanas v. Bica*, No. 74-882, 1975 WL 173815 (U.S. Sept. 19, 1975) .........Add. 4

i

<div style="border:1px solid black; padding:10px;">

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 14. Restricting Welfare and Public Benefits for Aliens
            Subchapter II. Eligibility for State and Local Public Benefits Programs

</div>

8 U.S.C.A. § 1621

§ 1621. Aliens who are not qualified aliens or
nonimmigrants ineligible for State and local public benefits

Effective: October 28, 1998
Currentness

**(a) In general**

Notwithstanding any other provision of law and except as provided in subsections (b) and (d), an alien who is not--

**(1)** a qualified alien (as defined in section 1641 of this title),

**(2)** a nonimmigrant under the Immigration and Nationality Act [8 U.S.C.A. § 1101 et seq.], or

**(3)** an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C.A. § 1182(d) (5)] for less than one year,

is not eligible for any State or local public benefit (as defined in subsection (c)).

**(b) Exceptions**

Subsection (a) shall not apply with respect to the following State or local public benefits:

**(1)** Assistance for health care items and services that are necessary for the treatment of an emergency medical condition (as defined in section 1396b(v)(3) of Title 42) of the alien involved and are not related to an organ transplant procedure.

**(2)** Short-term, non-cash, in-kind emergency disaster relief.

**(3)** Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

**Add. 1**

**(4)** Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (A) deliver in-kind services at the community level, including through public or private nonprofit agencies; (B) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (C) are necessary for the protection of life or safety.

(c) "State or local public benefit" defined

**(1)** Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term "State or local public benefit" means--

**(A)** any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and

**(B)** any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government.

**(2)** Such term shall not apply--

**(A)** to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect;

**(B)** with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C.A. § 1101 et seq.] qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Secretary of State, after consultation with the Attorney General; or

**(C)** to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.

**(3)** Such term does not include any Federal public benefit under section 1611(c) of this title.

**(d) State authority to provide for eligibility of illegal aliens for State and local public benefits**

Add. 2

A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.

### CREDIT(S)

(Pub.L. 104-193, Title IV, § 411, Aug. 22, 1996, 110 Stat. 2268; Pub.L. 105-33, Title V, §§ 5565, 5581(b)(1), Aug. 5, 1997, 111 Stat. 639, 642; Pub.L. 105-306, § 5(b), Oct. 28, 1998, 112 Stat. 2927.)

Notes of Decisions (6)

8 U.S.C.A. § 1621, 8 USCA § 1621
Current through P.L. 116-140.

Add. 3

1975 WL 173815 (U.S.) (Appellate Brief)
Supreme Court of the United States.

Leonor Alberti DE CANAS and Miguel Canas, Petitioners,

v.

Anthony G. BICA and Juan Silva, Respondents.

No. 74-882.
October Term, 1975.
September 19, 1975.

On Writ of Certiorari to the Court of Appeal of the State of California, Second Appellate District

**Brief of Respondents**

Robert L. Trapp, Jr., 221 East Cook Street, Santa Maria, California 93454, Telephone: (805) 925-2551

William S. Marrs, 2855 Telegraph Avenue, Berkeley California 94705, Telephone: (415) 644-7145, Attorneys for Respondents.

**\*i  SUBJECT INDEX**

Question presented ................................................................................................ 1
Statement of the case ............................................................................................ 1
Summary of argument .......................................................................................... 2
Argument ................................................................................................................ 2
States cannot legislate in areas which interfere with the foreign affairs of the United States or which affect the federal scheme of immigration and naturalization ................ 2
A. Foreign affairs and immigration and naturalization are areas in which there is such an overpowering federal interest that states are foreclosed from intrusion ...................... 2
B. Even assuming that states could legislate in the field of immigration and naturalization absent federal legislation, the Immigration and Nationality Act of 1952, as amended in 1965, effectively precludes any state legislation ...................................... 6
C. [🚩] Section 2805 of the California Labor Code is unconstitutional because it is in direct conflict with the Immigration and Nationality Act of 1952, as amended in 1965 .. 14
Conclusion ............................................................................................................ 24

**Index to Appendix**

1. [🚩] Section 2805, California Labor Code ................................................................. i
2. [🚩] 8 USC 1101 ........................................................................................................ i
3. [🚩] 8 USC 1103 ........................................................................................................ iii
4. [🚩] 8 USC 1182(a) (14) (1952-1965) ...................................................................... v
5. [🚩] 8 USC 1182(a) (14) (1965-present) .................................................................. v
6. [🚩] 8 USC 1182(d) .................................................................................................. vi
7. [🚩] 8 USC 1251 ........................................................................................................ vi
8. [🚩] 8 USC 1324 ........................................................................................................ vii
9. 29 CFR § 60.3 ........................................................................................................ viii
10. H.R. 8713 Sec. 2 .................................................................................................. ix

**\*ii  TABLE OF AUTHORITIES CITED**
**Cases**

Add. 4

Burbank v. Lockheed Air Terminal, 411 U.S. 624 (1973) ...................................................... 23

Chae Chan Ping v. U.S. 130 U.S. 581 (1889) ........ 3, 21, 23

Charleston & W. C. R. Co. v. Varnville Furniture Co., 237 U.S. 596 (1914) .................................................. 9

Chy Lung v. Freeman, 92 U.S. 75 (1875) .................. 3, 21

Cooley v. Board of Port Wardens, 12 How. 299..... 7

Ekiu v. U.S., 142 U.S. 651 (1892) .......................... 4, 21

Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132................................................................ 7

Godoy v. Rosenberg, 415 F.2d 1266 (9th Cir. 1969) ........................................................................... 11

Goldstein v. California, 412 U.S. 546 (1973) ........ 20, 21, 22

Graham v. Richardson, 403 U.S. 365 (1971) ......... 5, 21

Henderson v. Mayor of New York, 92 U.S. 259 (1875) ........................................................................ 3, 14, 21

Hines v. Davidowitz, 312 U.S. 52 (1940) .............. 5, 14, 15, 21, 23

Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974) ........................................................................ 21, 22

Kolovrat v. Oregon, 366 U.S. 187 (1961) .............. 5, 21

Lee Fook Chuey v. Immigration and Naturalization Service, 439 F.2d 244 (9th Cir. 1971) .. 11

Merrill Lynch, Pierce, Fenner and Smith v. Ware, 414 U.S. 117 (1973) .......................................... 21, 22

Motor Coach Employees v. Lockridge, 403 U.S. 274 (1971) .................................................................. 23

Muslemi v. Immigration and Naturalization Service, 408 F.2d 1196 (9th Cir. 1969) ....................... 11

New York State Department of Social Services v. Dublino, 413 U.S. 405 (1973) .................................... 20, 21, 22

Pennsylvania v. Nelson, 350 U.S. 497 (1955) ........ 7, 8, 14, 21

Perez v. Campbell, 402 U.S. 637 (1971) .............. 23

San Diego Building Trades Council v. Garmon, 359 U.S. 236................................................................ 7

Smith v. Turner, 48 U.S. 283 (1849) .......................... 3

Takahashi v. Fish & Game Commissioner of California, 334 U.S. 410 (1948) ................................. 21

Truax v. Raich, 239 U.S. 33 (1915) ....................... 5, 6, 21

*iii United States v. Evans, 333 U.S. 483 (1948) 16

United States v. Gostavo Osuna Picos, 443 F.2d 907 (9th Cir. 1971) ..................................................... 11

U.S. v. Pink, 315 U.S. 203 (1942) ......................... 5

Vitale v. Immigration and Naturalization Service, 443 F.2d 907 (9th Cir. 1971) ....................................... 11

Zschernig v. Miller, 389 U.S. 429 (1968) .............. 5, 14, 21

Add. 5

**Codes**

Labor Code, Section 2805 .......................................     1, 2, 4, 5, 6, 8, 13, 14, 15, 16, 20, 24

**Constitutions**

United States Constitution:

Art. I, Sec. 8 ...................................................................     3

Art. I, Sec. 8, clause 4 ...................................................     2

Art. I, Sec. 9 ...................................................................     3

Art. VI. ............................................................................     3

**House Reports**

No. 982 ..........................................................................     18

No. 982, Sec. 2 ..............................................................     18

No. 1365, pp. 1653-1655 .............................................     6

No. 8713, pp. 3, 4, 5 .....................................................     18

**Statutes**

Farm Labor Contractor Registration Act of 1963 .......     20

Immigration Act of 1917 .............................................     16

Immigration and Nationality Act of 1952:

Section 212(a)(14) ........................................................     11, 12

8 USC:

Sections 1101 et seq. ...................................................     8

Section 1101(a)(15)(A) .................................................     9

**\*iv** Section 1101(a)(15)(H)(ii) ...........................     16, 17

Section 1103 .................................................................     7

Section 1182(a)(14) ......................................................     15, 17, 18

Section 1182(d) ............................................................     13

Section 1182(d)(5) ........................................................     13

Section 1251 .................................................................     11

Section 1251(f) .............................................................     11

Section 1322(a) ............................................................     18

Section 1324(a) ............................................................     2, 16, 17, 18

**Texts**

The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court, 75 Colum. L. Rev. 637 .................................................................................     5

1 Gordon and Rosenfield, Immigration Law and Procedure, pp. 1-27 .....................................................     3

U.S. Code, Cong. & Admin. News (1952):

Page 276 ........................................................................     8

Pages 1653-1755 ..........................................................     6, 8, 16

U.S. Code, Cong. & Admin. News (1955):

Page 3344, Sec. 18 .......................................................     18

U.S. Code, Cong. & Admin. News (1965):

Page 3329 ......................................................................     17

Page 3333 ......................................................................     17

Page 3334 ......................................................................     17

**Other Authorities**

29 C.F.R.:

Section 60.3 ..................................................................     13

Section 60.3(a) .............................................................     12

Section 60.3(e)(2) ........................................................     13

Section 60.6 ..................................................................     12, 13

Section 60.6(i) ..............................................................     12

Add. 6

Section 60.6(j) ............................................. 12
Section 60.6(i)(2)(i) .................................... 12
Section 602.10(e)(3) ................................... 13
33 Fed. Reg. No. 176, p. 12808 ................................ 12
36 Fed. Reg. No. 24, p. 2464 ..................................... 12

## *1  QUESTION PRESENTED

Is Section 2805 of the California Labor Code an unconstitutional attempt to encroach upon the Federal scheme of immigration and foreign affairs?

## STATEMENT OF THE CASE

Petitioner sought injunctive relief and damages pursuant to Section 2805, California Labor Code. A demurrer without leave to amend was sustained on February 14, 1973. The Court of Appeals, Second **\*2** Appellate District, State of California, affirmed on July 26, 1973. Petition for hearing by the California Supreme Court was denied on October 24, 1974. The United States Supreme Court granted the petition for a Writ of Certiorari on June 23, 1975.

## SUMMARY OF ARGUMENT

States cannot legislate in the field of immigration and naturalization, even absent Congressional legislation. Immigration is a field which is reserved to the Federal government. The Federal government has completely occupied this field by passage of the Immigration and Nationality Act of 1952, as amended in 1965. Section 2805 of the California Labor Code is in direct conflict with 8 USC §1324(a), Immigration and Nationality Act of 1952, as amended in 1965.

## ARGUMENT

**STATES CANNOT LEGISLATE IN AREAS WHICH INTERFERE WITH THE FOREIGN AFFAIRS OF THE UNITED STATES OR WHICH AFFECT THE FEDERAL SCHEME OF IMMIGRATION AND NATURALIZATION.**

**A. Foreign affairs and Immigration and Naturalization are areas in which there is such an overpowering Federal interest that states are foreclosed from intrusion.**

The United States Constitution provides, in Article I, Section 8, clause 4:

"The Congress shall have the Power . . . to establish a uniform rule of Naturalization . . ."

This power is exclusive.

**\*3**  There is no direct mandate in the United States Constitution dealing with the power to regulate immigration. The federal government did not adopt immigration restrictions for its first 100 years. However, whenever states attempted to control immigration, their attempts were struck down under the theory that the regulation of

Add. 7

immigration concerned foreign commerce and this was an area exclusively that of the federal government. *The Passenger Cases (Smith v. Turner)* 48 U.S. 283, (1849); *Henderson v. Mayor of New York,* 92 U.S. 259, (1875); *Chy Lung v. Freeman,* 92 U.S. 75, (1875); Gordon and Rosenfield, Immigration Law and Procedure, Vol. 1, pages 1-27.

In subsequent decisions this Court enlarged the scope of federal power in this area, and stated that the power to regulate immigration was implied from two sources. The first source of implied power is from the specific directives in the Constitution to regulate foreign commerce,[1] declare war,[2] make treaties,[3] establish a uniform rule of Naturalization,[4] prohibit the importation of persons,[5] and to make all necessary and proper laws.[6] The second source of implied powers to regulate immigration is as an incident of national sovereignty without any specific grant in the Constitution. *Chae Chan Ping v. U.S.,* 130 U.S. 581 (1889); **\*4** *Ekiu v. U.S.,* 142 U.S. 651 (1892). In *Ekiu v. U.S.,* the Court stated at page 659:

[1]     Article I, § 8.

[2]     Article I, § 8.

[3]     Article VI.

[4]     Article I, § 8.

[5]     Article I, § 9.

[6]     Article I, § 8.

"It is an accepted maxim of international law, that every sovereign nation has the power, as inherent sovereignty, and essential to self preservation to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."

Congress and the Federal government are not unaware of the problem of the illegal alien.[7] Petitioner's brief, pages 8-14, depicts the magnitude of the problem. The ultimate objective of 2805 of the Labor Code[8] is **\*5** to expel all "aliens not entitled to lawful residence" from California. They will migrate to the other states of the Union or to the Republic of Mexico or Canada.[9] This amounts to a regulation of immigration and is not permitted by the individual states. It will also cause severe problems with foreign governments (particularly Mexico) concerned about the treatment of their nationals inside this country.

[7]     It should be noted that 2805 of the Labor Code deals with "aliens not entitled to lawful residence if such employment would have an adverse effect on lawful resident workers." Petitioner has attempted to reduce this to "illegal aliens", which of course it is not as will be shown later. While the issue is not before this court now, 2805 of the Labor Code is also probably unconstitutional on Due Process grounds, i.e., it is a criminal statute which is so vague that an ordinary man will not know how to conform to its prohibitions. How is an employer to determine lawful residence? When does such employment have an adverse effect- on a daily, weekly, monthly basis? If there is a labor shortage in Northern California, are employers there allowed to hire aliens not entitled to lawful residence, while those in Southern California are not? If a particular industry has a labor shortage which cannot be filled by the domestic labor market, may those employers hire aliens not entitled to lawful residence?

[8]     Section 2805 of the California Labor Code reads as follows:

**Add. 8**

FN"(a) No employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers.

FN"(b) A person found guilty of violation of subdivision (a) is punishable by a fine of not less than two hundred dollars ($200.00) nor more than five hundred dollars ($500.00) for each offense.

FN"(c) The foregoing provisions shall not be a bar to civil action against the employer based upon a violation of subdivision (a)."

9    It is also possible that those terminated would seek general welfare assistance. If such assistance were denied, they would again be forced to migrate to Mexico, Canada, or throughout the other states of the Nation. If the assistance were obtained, then 2805 of the Labor Code would be subverting California's legitimate interest in promoting self-reliance and assuring that limited state welfare funds be spent on behalf of those genuinely incapacitated and most in need.

This Court has consistently held that individual states may not interfer with the Federal Government's foreign affairs and its regulation of aliens. *Hines v. Davidowitz,* 312 U.S. 52, (1940), *U.S. v. Pink,* 315 U.S. 203 (1942), *Kolovrat v. Oregon,* 366 U.S. 187 (1961), *Zschernig v. Miller,* 389 U.S. 429 (1968), *Graham v. Richardson,* 403 U.S. 365 (1971).

One commentator suggests that the Federal interest in foreign affairs is so strong that it forecloses any recognition of corresponding state interests. Note: *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court,* 75 Colum. L. Rev. 637.

This Court in *Truax v. Raich,* 239 U.S. 33, (1915) held that an Arizona law, which effectively deterred interstate migration of aliens by imposing a substantial limitation on employment opportunities interfered with the power of the federal government to **\*6** admit persons to this country under acts of Congress. At page 42, 239 U.S., the Court states:

"The authority to control immigration-to admit or exclude aliens-is vested solely in the Federal government."

Labor Code Section 2805 likewise seeks to control immigration into the State of California and the migration of aliens interstate by seeking to abolish their employment opportunities. [10]

10    Petitioners may contend that the situation is unlike *Truax v. Raich* because Section 2805 only deals with aliens not entitled to lawful residence while *Truax* applied to aliens otherwise lawfully admitted into the United States. Analytically this is incorrect, because there may be some time, either at the present or in the future, when employment of aliens not entitled to lawful residence would not have an adverse effect on lawful resident workers. If that situation arose, then it would not be a violation of Section 2805 to hire an alien not entitled to lawful residence and California would actually be encouraging the entry of aliens not entitled to lawful residence. This again amounts to an attempt to control immigration.

Add. 9

### B. Even assuming that states could legislate in the field of immigration and naturalization absent federal legislation, the Immigration and Nationality Act of 1952, as amended in 1965, effectively precludes any state legislation.

Congress specifically intended to completely occupy the field of Immigration. This includes the right to exclude aliens at the border and to expel such aliens as it desires from within its borders and in which ways it wants the aliens expelled. U.S. Code, Cong. & Admin. News, 1952, pages 1653-1755. The House Report (No. 1365) discusses the power of Congress at pages 1653-1655 and contains the following:

"The expulsion of aliens is a *sovereign power* necessary to the safety of the country, to be regulated **\*7** by the *legislative* department." (Emphasis added).

The Act itself provides that the Attorney General shall be charged with the administration and enforcement of the Act and all other laws relating to the immigration and naturalization of aliens, except insofar as the Act or other laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State or diplomatic or counsular officers. 8 USC §1103.

This is not a case involving historic police powers of the States. *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132. It is a subject by its own very nature admitting only of national supervision. *Cooley v. Board of Port Wardens,* 12 How. 299, 319-320. It is also a subject demanding exclusive federal regulation in order to achieve uniformity vital to national interests. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 241-244.

*Pennsylvania v. Nelson,* 350 U.S. 497 (1955), declared the test to be used to determine whether the federal government has so occupied a field that a state cannot legislate in that area.

"First, the scheme of federal regulation is so persuasive as to make reasonable the inference that Congress left no room for the states to supplant it." Page 502.

"Second, the federal statutes touch a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement **\*8** of state laws on the same subject." Page 504.

"Third, enforcement of State Sedition Act presents a serious danger of conflict with the administration of the federal program." Page 505.

In *Pennsylvania v. Nelson,* supra, the State of Pennsylvania had enacted the Pennsylvania Sedition Act. This Court held that the federal government by enacting the Smith Act of 1940, and amending it in 1948, invalidated the state law under the doctrine of federal suppression.

It must be conceded that Congress has enacted a comprehensive scheme for immigration and nationality. The Immigration and Nationality Act of 1952 is found at 8 USC § 1101 et seq. It was passed over President Truman's veto on January 27, 1952. U.S. Code, Cong. & Admin. News, 1952, page 276. The volume and subject matter alone indicate the comprehensiveness of the Act. Congress thought that it was enacting a comprehensive law as the committee states at page 1653 U.S. Code, Cong. & Admin. News, 1952:

Add. 10

**"Purpose of the Bill**

The purpose of the bill is to enact a comprehensive, revised immigration, naturalization and nationality code."

By virtue of the comprehensive legislation in this area, the State of California is precluded from also legislating.

Clearly the tests of *Nelson* are met, and  Section 2805 must fall. First, the scheme of federal regulation is so pervasive as to make reasonable the **\*9** inference that Congress left no room for the states to supplement it. Second, as was shown previously in Part A of this brief, the federal statutes touch a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of same laws on the same subject. Third, the enforcement of the state act presents a serious danger of conflict with the administration of the federal program as it could expel masses of aliens not entitled to lawful residence to other states and across international borders. As Justice Holmes said in *Charleston & W. C. R. Co. v. Varnville Furniture Co.,* 237 U.S. 596 (1914):

> "When Congress has taken a particular subject matter in hand, coincidence is as ineffective as opposition, and the state law is not to be declared a help because it attempts to go further than Congress has seen fit to go."

In addition, there are statutory provisions and administrative decisions which compel the result that this field has been completely occupied.

There are many statutory classifications of aliens who are permitted employment but are not entitled to lawful residence. Among these are:

 8 USC 1101(a)(15)(A) An ambassador, public minister, or career diplomat who has been accredited by a foreign government recognized de jure by the United States and the members of the alien's immediate family may work and may employ necessary personal employees.

Subsection (iii) recognizes the right to work of attendants, servants, personal employees and members **\*10** of the immediate families and employees who have a non-immigrant status under Section (A) above.

Subdivision (B) thereof, an alien having a residence in a foreign country which he has no intention of abandoning, and who is visiting the United States temporarily for business may be employed in the United States without having residence here.

Subdivision (D) thereof, an alien crewman serving on board a vessel or aircraft is permitted employment.

Subdivision (E) thereof, an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of Commerce and Navigation between the United States and a foreign state of which he is a national; or (i) solely to carry out substantial trade principally between the United States and the foreign State of which he is a national; or (ii) solely to develop and direct the operations of an enterprise in which he has invested or of an enterprise of which he is actively in the process of investing, substantial amounts of capital. These are properly known as treaty traders and treaty investors.

**Add. 11**

Subdivision (F)(i) permits an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study may work while pursuing his course of study, with the approval of the District Director of Immigration.

Subdivision (L) permits the intercompany transfer of aliens not entitled to lawful residence in order to continue to render his services to the same employer.

 **\*11**   Also, there is a long line of decisions, beginning with *Muslemi v. Immigration and Naturalization Service,* 408 F.2d 1196 (9th Cir. 1969) which provides for relief from deportation of aliens who are in the United States fraudulently. *Godoy v. Rosenberg,* 415 F.2d 1266 (9th Cir. 1969); *Lee Fook Chuey v. Immigration and Naturalization Service,* 439 F.2d 244 (9th Cir. 1971); *United States v. Gostavo Osuna Picos,* 443 F.2d 907 (9th Cir. 1971); *Vitale v. Immigration and Naturalization Service,* 443 F.2d 907 (9th Cir. 1971). These cases all involve aliens who were relieved from deportation pursuant to 8 USC 1251(f) [11]  and are eligible for employment.

11      8 USC § 1251. Relationship to United States citizen or lawfully admitted alien as affecting deportation for fraudulent entry.
        (f) The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence.

The above are just a few of the people not entitled to lawful residence who are recognized as being entitled to employment.

Petitioner's contention that the Federal government is inviting the states to cooperate in a plan to punish employers for knowingly hiring illegal aliens is contradicted by actions taken by the U.S. Labor Department itself. In determining which employers would be permitted to secure labor certifications pursuant to 212(a)(14) (determination of adverse effect on domestic labor), the Labor Department adopted Regulation  **\*12**  60.6(i) and (j) of 29 CFR on September 10, 1968. 33 Fed. Reg. No. 176, p. 12808.

In summary, 29 CFR 60.6(i)(2)(i) [12]  provided that an employer would be denied a labor certification if he used an agent (or agency) who referred an illegal alien for employment within the previous 3 years. 29 CFR 60.6(j) [13] provided that a labor certification would be denied if an employer knowingly hired an illegal alien (alien who entered the United States without inspection) within three years.

12      29 CFR § 60.6 Matters to be considered.
        Prospective employment offered in accordance with § 60.3(a) will be deemed to adversely affect "wages" or "working conditions" of American workers within the meaning of section 212(a)(14) of the Act unless it appears: * * *
        (i) That such employment is not procured through an agent (or agency) which has within 3 years prior to the offer (1) concealed the extent of his participation in the placement of an alien, or (2) referred to employment an alien who (i) entered the United States without inspection, or (ii) was in the United States as a nonimmigrant and whose employment violated his nonimmigrant status, unless such agent

**Add. 12**

demonstrates that he did not know, had no reasonable grounds to know, or could not be reasonable inquiry have ascertained knowledge of these circumstances.

13      29 CFR § 60.6.
(j) That such employment is not with an employer who has within three years prior to the offer hired an alien who (1) entered the United States without inspection, or (2) was in the United States as a nonimmigrant and whose employment violated his nonimmigrant status, unless such employer demonstrates that he did not know, had no reasonable grounds to know, or could not by reasonable inquiry have ascertained knowledge of these circumstances.

On February 4, 1971, the U.S. Department of Labor withdrew both of these regulations. 36 Fed. Reg. No. 24, p. 2464. They have not been replaced with anything similar. The conclusion is inescapable. The Federal government, through the executive branch, is not going **\*13** to regulate immigration and foreign affairs by penalizing employers for knowingly hiring illegal aliens.

This attitude is expressed in 29 CFR 60.3(e)(2) [14] which states that an employer is not subject to a denial of certification on the ground of employing an alien who works without authorization.

14      29 CFR § 60.3. Requests for certification.
(e) Forms: Application for Alien Employment Certification.
(2) Job Offer for Alien Employment-MA 7-50B (formerly ES-575B). This form provides for a description of the alien's prospective employment in the United States. It is to be completed by a prospective employer. (Because of changes in these regulations effectuated since the issuance of Form MA 7-50B, the note printed between items 3 and 4 of that form is modified to the extent that an employer is not subject to a denial of certification on the ground of employing an alien who works without authorization.

Petitioner's reliance on 29 CFR 602.10(e)(3) is not well placed. That regulation applies only to employment in the Agricultural and Logging industry. 2805 of the Labor Code applies to all employment, as does 29 CFR 60.6.

A final example of the need for an exclusive federal regulatory scheme in this field is the status of approximately 130,000 South Viet Nam refugees in this country. They were admitted under 8 USC §1182(d)(5) of the Act which permits the Attorney General to grant entry on a parole status to aliens. [15] After **\*14** two years, these aliens will be allowed to apply for an adjustment of status to an immigrant lawfully admitted for permanent residence. During this time, they are not entitled to lawful residence and would be unable to secure employment in California if Labor Code 2805 were enforced. Such a result would completely frustrate the Federal government's purpose in bringing the refugees to this country.

15      USC § 1182(d)
(5) The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

**Add. 13**

### C. Section 2805 of the California Labor Code is unconstitutional because it is in direct conflict with the Immigration and Nationality Act of 1952, as amended in 1965.

Section 2805 should fall because it is an attempt to regulate immigration, *Henderson v. Mayor of New York,* supra, interfers with the foreign affairs of the Federal government, *Zschernig v. Miller,* supra, and because Congress has completely occupied the field of immigration, *Pennsylvania v. Nelson,* supra.

It must also fall under the theory of *Hines v. Davidowitz,* 312 U.S. 52, (1940). In *Hines,* supra, the State of Pennsylvania passed an alien registration law which required all aliens to register and carry alien identification cards. The federal government, in 1940, passed the Alien Registration Act. Davidowitz, an alien, filed an action to declare the Pennsylvania Act unconstitutional. He advanced two theories, summarized at 312 U.S. 59. First, the Pennsylvania Act encroached on a field reserved for the federal government. Second, it was a denial of equal protection. Justice Black, writing for the majority, restricted the ruling to: "Whether, by adoption of a comprehensive, integrated scheme for regulation of aliens, Congress **\*15** has precluded state action." This was resolved in favor of Davidowitz, *Hines v. Davidowitz,* supra, page 62 and 63:

> "That the supremacy of national power in the general field of foreign affairs, including power of immigration, naturalization, and deportation, is made clear by the Constitution, was pointed out by the authors of the Federalist in 1787 (fn omitted). When the national government, by treaty or statute has established rules and regulations touching the rights, privileges, obligations, or burdens of aliens as such, the treaty or the statute is the supreme law of the land. No state can add to or take from the force in effect of such treaty or statute. . . ."

The opinion continues, at page 66 and 67:

> "And where the Federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law or enforce additional or auxiliary regulations (fn omitted)."

All that need be added to the present case is the substitution in the above statement of the word "employment" for the word "registration."

Petitioner maintains that Section 2805 is consistent with the Federal scheme of immigration. As such, Petitioner states that Section 2805 reinforces the policy expressed in 8 USC § 1182(a)(14), (applicants for **\*16** permanent admission), and 8 USC § 1101(a)(15)(H) (ii) (issuing of labor certificates to temporary workers who are non-immigrants and perform labor if unemployed workers in this country cannot be found).

Add. 14

It is obvious, however, that 🚩 Section 2805 has nothing to do with either temporary employment of nonimmigrants without visas or permanent admission of immigrants. It is directed solely at employers of "aliens not entitled to lawful residence." This area has also been specifically dealt with by Congress in 🏳 8 USC § 1324(a) which provides a comprehensive scheme for defining the crimes of transporting or harboring, or inducing entry of any alien not lawfully entitled to enter or reside within the United States. The statute itself emphasized that employment was not a violation of the Act. *"Provided, however,* etc."

The legislative history is not silent on this matter either. U.S. Code, Cong. & Admin. News, 1952, page 1724:

> "The committee wishes to state that employment (including the usual and normal practice incident to employment) shall not be deemed to constitute harboring, and, with this reservation, the committee strongly recommends the enactment of Section 274 [🏳 1324(a)] as amended."

🏳 Section 1324(a) was the subject of concern when the Immigration and Nationality Act of 1952 was under consideration. This was necessitated by the decision in 🏳 *United States v. Evans,* 333 U.S. 483 (1948) which held that the penalty provisions under the Immigration Act of 1917 were inadequate to provide **\*17** a penalty for concealing or harboring aliens unlawfully in the United States. 🏳 Section 1324(a) was rewritten so that concealing or harboring were violations of the Act. It is thus clear that Congress addressed itself squarely on the issue of employment of aliens not entitled to lawful residence and declared that it was not unlawful.

Petitioner places much reliance on the amendments to the Act which were made in 1965. However, those amendments address themselves to the issuing of visas to aliens seeking employment. 🏳 8 USC § 1182(a)(14) was amended to put the burden on the alien to establish that there were not sufficient workers in the United States at the alien's destination who are able, willing and qualified to perform the skilled or unskilled labor and that his employment would not adversely affect wages and working conditions of U.S. citizens similarly employed. U.S. Code, Cong. & Admin. News, 1965, pages 3333 and 3334. At page 3329 the Committee's report, Item No. 7 states:

> "7. Safeguards to protect the American economy from job competition and from adverse working standards as a consequence of immigrant workers entering the labor market are strengthened."

This, of course, has nothing to do with employment of aliens not entitled to lawful residence. Had the petitioner charged that the Secretary of State was issuing visas contrary to the provisions of 🏳 8 USC § 1182 (a)(14) or labor certificates pursuant to 🚩 § 1101(a) (15)(H)(ii) then he could seek relief in Federal District Court.

**\*18** Petitioner would have the Court believe that by amending 🏳 8 USC § 1182(a)(14), Congress was inviting the individual states to pass laws which would restrict the employment of aliens not entitled to lawful residence in the United States. There is a major problem with such a theory. Congress would have had to address itself to

Add. 15

the penalty provision chapter of the Immigration Title of the Act rather than the admission qualifications chapter. It then would have had to delete the employment exemption and/or create a new crime, namely that of employing aliens not entitled to lawful residence. It did neither of these. It did examine the penalty provision chapter and amended 1322(a) to bring it into conformity with § 1182(a)(14). U.S. Code, Cong. & Admin. News, 1955, page 3344 (Section 18).

Congress is not ignorant of the problem of employment of aliens not entitled to lawful residence. On May 3, 1973, the House of Representatives passed H.R. 982. [16] The section of concern for this case of H.R. 982 is Section 2. The bill amends 8 USC § 1324(a) to provide a penalty for knowingly employing any alien not lawfully admitted to the United States for permanent residence. It involves a three-step procedure in which an employer is first cited, then fined civilly, and finally charged with a misdemeanor on the third offense. (H.R. 8713, pages 3, 4 and 5).

[16] H.R. 982 has been reintroduced in this session of Congress again as H.R. 982. It was re-numbered H.R. 8713 and passed out of the Judiciary Committee on July 30, 1975.

**\*19** Some relevant portions of the committee (judiciary) report (93-108 to accompany H.R. 982, 93rd Congress, 1st Session) include:
"Since under present law there is no prohibition on the employment of illegal aliens . . ." page 6.

"The original legislation before the Committee (H.R. 2328, 92nd Congress, which was introduced at the request of the administration), would have provided a $1,000 fine and/or one year imprisonment for a first violation. The Committee reviewed this approach as too severe, and recognized the possibility of employment discrimination if criminal penalties were initially imposed. Consequently the Committee rejected this approach and instead, substituted the graduated three-step procedure for the imposition of sanctions." Pages 12 and 13.

"Not only is the employment of unlawful aliens not illegal under present law, but such employment actually appeared to be condoned by the existing proviso in Section 274(a)(4) [1324 (a)(4)] that employment shall not be deemed to constitute the harboring of illegal aliens." Page 15.

"Moreover, despite the fact that eight out of ten illegal aliens apprehended are Mexican natives, the problem is no longer restricted to the agricultural and border area of the Southwestern United States. Increasingly, illegal aliens travel, or arrange to be transported, to all of the metropolitan areas in the United States, where they can obtain higher-paying jobs in industry and, at the same time, more easily escape detection by Immigration authorities." Page 5.

**\*20** It is clear that Congress has carefully considered the problem of employment of aliens not entitled to lawful residence. It is also clear that Congress has made the express determination that such employment is not unlawful. It may decide to alter this position in the future, but that is a matter strictly within its jurisdiction, and not that of the individual States. Section 2805 of the Labor Code is not an aid to the federal scheme, but is in direct conflict with it and is invalid.

Petitioner's statement that the passage of the amendments to the Farm Labor Contractor Registration Act of 1963 is an expression of Congressional intent to control the employment of illegal aliens is in error. 2805 of the Labor Code applies to all employers in the State of California. The Farm Labor Contractor Registration Act applies only to farm labor contractors. Congress is well aware that employment of aliens not entitled to lawful residence is permitted. By restricting the prohibition of employing aliens not entitled to lawful residence to farm labor

**Add. 16**

contractors, it is affirming its long-held position that all other employers are not to be punished for the employment of aliens not entitled to lawful residence.

Recent decisions of this Court must be analyzed to determine whether 2805 of the Labor Code is a valid expression of a state interest or an intrusion into an area taken by the Federal government.

Petitioner's reliance on Goldstein v. California, 412 U.S. 546 (1973); *21 New York State Department of Social Services v. Dublino, 413 U.S. 405 (1973); Merrill Lynch, Pierce, Fenner and Smith v. Ware, 414 U.S. 117 (1973); and Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974) are distinguishable on subject matter grounds. Goldstein v. California, supra, dealt with the preemptive scope of the copyright clause; New York State Department of Social Services v. Dublino, supra, involved the Work Incentive Program of the Social Security Act; Merrill Lynch, Pierce, Fenner and Smith v. Ware, supra, dealt with an arbitration rule promulgated by the New York Stock Exchange; Kewanee Oil Co. v. Bicron Corp., supra, was concerned with federal patent laws and Ohio's trade secret laws.

None of the above cases concerned aliens, immigration, or foreign affairs. Indeed, this Court has consistently refused to let the individual states operate in these areas. Graham v. Richardson, supra; Zschernig v. Miller, supra; Kolovrat v. Oregon, supra; Pennsylvania v. Nelson, supra; Hines v. Davidowitz, supra; Takahashi v. Fish & Game Commissioner of California, 334 U.S. 410 (1948); Truax v. Raich, 239 U.S. 33; Henderson v. Mayor of New York, supra; Ekiu v. U.S., supra; Chy Lung v. Freeman, supra, Chae Chan Ping v. U.S., supra.

The aforementioned cases are also distinguishable on analytical grounds. In Goldstein v. California, supra, there was the absence of a federal statute to allow federal copyright protection of recordings, 412 U.S. 546, 552. Also, the subject matter to which the Copyright Clause is addressed may be of purely local *22 importance and not worthy of national attention. 412 U.S. 546, 558. In Kewanee Oil Co. v. Bicron, supra, this court again found the essentially nonuniform character of the appreciation of intellectual achievements in the various states and held that states may hold diverse viewpoints in protecting intellectual property relating to inventions. 416 U.S. 470, 479. The Court found no conflict with the operation of federal laws, and noted that trade secret law and patent law have co-existed in this country for over one hundred years. 416 U.S. 470, 493.

In Merrill Lynch, Pierce, Fenner & Smith v. Ware, supra, the Court found that the purpose of the Securities Exchange Act was to insure fair dealing and protect investors from harmful or unfair trading practices. 414 U.S. 117, 130. The arbitration rule in question was found not needed as part of a uniform national regulation and was described as a housekeeping rule which was not necessary for the achievement of the national policy objectives. 414 U.S. 117, 136. In New York State Department of Social Services v. Dublino, the Court found no clear intent to supersede state law, 413 U.S. 405, 413; that states have considerable latitude in allocating their AFDC resources, since each state was free to set its own standard of need and determine the level of benefit by the amount of funds it devotes to the program, 413 U.S. 405, 414 (citations omitted). The Court also noted that 21 states had initiated welfare work requirements as a condition of AFDC eligibility when the federal work incentive program was passed by Congress. 413 U.S. 405, 414. The State of New York *23 and the federal government also had a complementary administrative framework. 413 U.S. 405, 421.

Add. 17

The present case offers none of these factors in opposition to preemption. There is a comprehensive federal act and administrative agency while there are no corresponding state laws or agencies concerning the same subject; there is a clear statement of Congressional intent to totally occupy and preempt the field; and most important, there is an overwhelming need for a uniform national policy in these areas. There is no area which lends itself more to the constitutional doctrine of preemption than regulation of aliens, immigration, and foreign affairs. Other recent decisions of this court have upheld preemption in fields which are national in character.

*Perez v. Campbell,* 402 U.S. 637 (1971). Federal Bankruptcy Act preempts motor vehicle responsibility statute;

*Motor Coach Employees v. Lockridge,* 403 U.S. 274 (1971), comprehensive national labor law preempts state court jurisdiction; *Burbank v. Lockheed Air Terminal,* 411 U.S. 624 (1973), Federal Aviation Agency and Environmental Protection Agency preempt state control of aircraft noise.

If there is one subject which does not lend itself to diverse treatment by the various States, it is that of immigration and foreign affairs. *Hines v. Davidowitz,* supra; *Chae Chan Ping v. U.S.,* supra, at page 606:

> "For local interests, the several States of the Union exists; but for international purposes, embracing our relations with foreign nations, we are but one people, one nation, one power."

## *24 CONCLUSION

In summary, it is respondents' contention that Section 2805 of the California Labor Code is unconstitutional under three separate and distinct theories of preemption.

First, it attempts to regulate immigration and foreign affairs and is unconstitutional because that is a subject matter over which the federal government has exclusive jurisdiction.

Second, assuming arguendo, that the States had concurrent juridiction over immigration and nationality, Section 2805 is unconstitutional because Congress has enacted a comprehensive scheme and left no room for the individual states to legislate.

Third, Congress has addressed itself to the specific area that Section 2805 does, namely penalties for the employment of aliens not entitled to lawful residence. It has expressly stated that such employment is not unlawful. Section 2805 is in direct conflict with this policy and is invalid.

Dated, Berkeley, California,
September 17, 1975.

Respectfully submitted,

ROBERT L. TRAPP, JR.,

WILLIAM S. MARRS,

Add. 18

By WILLIAMS S. MARRS,

*Attorneys for Respondents*.

**\*i  Appendix**

1. Section 🚩 2805 of the California Labor Code reads as follows:

"(a) No employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers.

"(b) A person found guilty of violation subdivision (a) is punishable by a fine of not less than two hundred dollars ($200.00) nor more than five hundred dollars ($500.00) for each offense.

"(c) The foregoing provisions shall not be a bar to civil action against the employer based upon a violation of subdivision (a)."

--------

2. 🚩 8 USC 1101. Definitions

🚩 8 USC 1101 (a) (15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens

(A) (i) an ambassador, public minister, or career diplomatic or consular officer who has been accredited by a foreign government recognized de jure by the United States and who is accepted by the President or by the Secretary of State, and the members of the alien's immediate family;

. . .

(iii) upon a basis of reciprocity, attendants, servants, personal employees, and members of their immediate families, of the officials and employees who have a nonimmigrant status under (i) and (ii) above;

 **\*ii**  (B) an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure;

(D) an alien crewman serving in good faith as such in any capacity required for normal operation and service on board a vessel (other than a fishing vessel having its home port or an operating base in the United States) or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft;

(E) an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national, and the spouse and children of any such alien if accompanying or following to join him: (i) solely to carry on substantial trade, principally between the United States and the foreign state of which he is a national; or (ii) solely to develop and direct the

**Add. 19**

operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital;

(F) (i) an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to **iii** enter the United States temporarily and solely for the purpose of pursuing such a course of study at an established institution of learning or other recognized place of study in the United States, particularly designated by him and approved by the Attorney General after consultation with the Office of Education of the United States, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn, and (ii) the alien spouse and minor children of any such alien if accompanying him or following to join him;

(L) an alien who, immediately preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him.

3. 🔖 8 USC 1103. Power and duties of the Attorney General and Commissioner; appointment of Commissioner

(a) The Attorney General shall be charged with the administration and enforcement of this chapter **iv** and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling. He shall have control, direction, and supervision of all employees and of all the files and records of the Service. He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions, [1] and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter. He is authorized, in accordance with the civil-service laws and regulations and chapter 51 and subchapter III of chapter 53 of Title 5, to appoint such employees of the Service as he deems necessary, and to delegate to them or to any officer or employee of the Department of Justice in his discretion any of the duties and powers imposed upon him in this chapter; he may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service. He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear **v** necessary and proper. He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service. He may, with the concurrence of the Secretary of State, establish officers of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

4. 🔖 8 USC 1182(a) (14) provided (1952-1965) for the exclusion of admission the following class of aliens: "Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, if the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) sufficient

Add. 20

workers in the United States who able, willing, and qualified are available at the time (of application for a visa and for admission to the United States) and place (to which alien is destined) to perform such skilled or unskilled labor or (B) the employment of such aliens will adversely affect the wages and working conditions of the workers in the United States similarly employed."

5. 8 USC 1182(a) (14) provides (1965-present) for the exclusion of admission the following class of **\*vi** aliens: "Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed . . ."

6. 8 USC 1182(d):

(5) The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

7. 8 USC 1251 Relationship to United States citizen or lawfully admitted alien as affecting deportation for fraudulent entry.

**\*vii** (f) The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or child of a United States citizen or of an alien lawfully admitted for permanent residence.

8. 8 USC 1324 "(a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who-

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of-any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this act or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection **\*viii** occurs: *Provided, however,* that for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring."

Add. 21

--------

9. 29 CFR § 60.3 Requests for certification.

(e) Forms: Application for Alien Employment Certification.

(2) Job Offer for Alien Employment-MA 7-50B (formerly ES-575B). This form provides for a description of the alien's prospective employment in the United States. It is to be completed by a prospective employer. (Because of changes in these regulations effectuated since the issuance of form MA 7-50B, the note printed between items 3 and 4 of that form is modified to the exent that an employer is not subject to a denial of certification on the grounds of employing an alien who works without authorization).

29 CFR § 60.6 (1969) Matters to be considered.

Prospective employment offered in accordance with § 60.3(a) will be deemed to adversely affect "wages" or "working conditions" of American workers within the meaning of section 212(a)(14) of the Act unless it appears: * * *

(i) That such employment is not procured through an agent (or agency) which has within 3 years prior to the offer (1) concealed the extent of his participation in the placement of an alien, or (2) referred to  *ix  employment an alien who (i) entered the United States without inspection, or (ii) was in the United States as a nonimmigrant and whose employment violated his nonimmigrant status, unless such agent demonstrates that he did not know, had no reasonable grounds to know, or could not by reasonable inquiry have ascertained knowledge of these circumstances; and

(j) That such employment is not with an employer who has within three years prior to the offer hired an alien who (1) entered the United States without inspection, or (2) was in the United States as a nonimmigrant and whose employment violated his nonimmigrant status, unless such employer demonstrates that he did not know, had no reasonable grounds to know, or could not be reasonable inquiry have ascertained knowledge of these circumstances.

--------

10. H.R. 8713. SEC. 2. Section 274 of the Immigration and Nationality Act ( 8 U.S.C. 1324) is amended by deleting the proviso in paragraph 4 of subsection (a) and by redesignating subsection (b) as subsection (e) and adding new subsections (b), (c), and (d) to read as follows:

"(b) (1) It shall be unlawful for any employer or any person acting as an agent for such employer, or any person who, for a fee, refers an alien for employment by such an employer knowingly to employ, continue to employ, or refer for employment any  *x  alien in the United States who has not been lawfully admitted to the United States for permanent residence, unless the employment of such alien is authorized by the Attorney General.

"(2) If, on evidence or information he deems persuasive, the Attorney General, after affording an opportunity to respond to and rebut such evidence or information, reasonably concludes that an employer, or a person acting as an agent for such an employer, or any person who, for a fee, refers an alien for employment by such an employer, employs, continues to employ, or refers for employment any alien in the United States who has not been lawfully admitted for permanent residence, or any alien whose employment has not been authorized by the Attorney General, the Attorney General may serve a citation on the employer, agent, or referrer containing a notification

Add. 22

that the alien's employment is not authorized and a warning of the penalties and injunctive remedy set forth in this section. The procedure prescribed by and the provisions of chapter 7 of title 5, United States Code, shall apply to and shall be the sole and exclusive procedure for the judicial review of a citation served by the Attorney General. An action for judicial review of a citation may be filed in the appropriate judicial district not later than sixty days from the date of issuance of the citation.

"(3) If, in a proceeding initiated within two years after the service of such citation, the Attorney General finds that any employer, agent, or referrer upon whom such citation has been served has thereafter **\*xi** violated the provisions of paragraph (1), the Attorney General shall assess a penalty of not more than $500 for each alien in respect to whom any violation of paragraph (1) is found to have occurred.

"(4) A civil penalty shall be assessed by the Attorney General only after the person charged with a violation under paragraph (3) has been given an opportunity for a hearing and the Attorney General has determined that a violation did occur, and the amount of the penalty which is warranted. The hearing shall be of record and conducted before an immigration officer designated by the Attorney General, individually or by regulation, and the proceeding shall be conducted in accordance with the requirements of title 5, section 554, of the United States Code.

"(5) If the person against whom a civil penalty is assessed fails to pay the penalty within the time prescribed in such order, the Attorney General shall file a suit to collect the amount in any appropriate district court of the United States. In any such suit or in any other suit seeking to review the Attorney General's determination, the suit shall be determined solely upon the administrative record upon which the civil penalty was assessed and the Attorney General's findings of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.

"(c) Any employer or person who has been assessed a civil penalty under subsection (b) (3) which has become final and thereafter violates subsection (b) (1) shall be guilty of a misdemeanor and upon conviction **\*xii** thereof shall be punished by a fine not exceeding $1,000, or by imprisonment not exceeding one year, or both, for each alien in respect to whom any violation of this subsection occurs.

"(d) The district court of the United States shall have jurisdiction to enjoin violations of subsection (b) (1). Such actions may be brought by the Attorney General in any United States district court for a district wherein any act, omission, or transaction constituting the violation occurred, or any such court for the district wherein the defendant is found or transacts business."

---

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   20

**Add. 23**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of September, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Paul R.Q. Wolfson*

PAUL R.Q. WOLFSON