No. 20-1707

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SHARON BAUER; RICHARD JURGENA,

*Plaintiffs-Appellants,*

*v.*

MARC ELRICH, in his official capacity as Montgomery County Executive;
RAYMOND L. CROWEL, in his official capacity as Director of Montgomery County
Department of Health and Human Services,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, Case No. 8:20-cv-01212-PJM
Before the Honorable Peter J. Messitte

**BRIEF OF AMICI CURIAE CITIES, COUNTIES, THE INTERNATIONAL MUNICIPAL
LAWYERS ASSOCIATION, AND THE U.S. CONFERENCE OF MAYORS
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Michael N. Feuer, City Attorney
Kathleen A. Kenealy, Chief Assistant City Attorney
Danielle L. Goldstein, Deputy City Attorney
Michael J. Dundas, Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY ATTORNEY
200 North Spring Street, 14th Floor
Los Angeles, California 90012-4131
Telephone: (213) 978-1882
Facsimile:  (213) 978-2286
danielle.goldstein@lacity.org

*Additional counsel listed on signature page*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the International Municipal Lawyers Association and U.S. Conference of Mayors each state that they have no parent corporation and no publicly held corporation owns 10% or more of either organization's stock. Remaining amici curiae are governmental entities for whom no corporate disclosure is required.

Dated: September 16, 2020      By:    */s/ Danielle L. Goldstein*
                                          Danielle L. Goldstein

                                        *Attorney for* Amicus Curiae *the City of Los Angeles*

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT..........................................i

TABLE OF AUTHORITIES ................................................................. iii

INTERESTS OF AMICI AND SUMMARY OF ARGUMENT .............................1

ARGUMENT ...................................................................................3

I.    Appellants' Construction of Section 1621 Forces State and Local Governments to Choose Between Two Unconstitutional Options. ............................................................................3

      A.    Option 1: Obey an unconstitutional prohibition on State and local lawmaking. ....................................................5

      B.    Option 2: Obey an unconstitutional command dictating the allocation of State and local decisionmaking authority. .....................................................................7

II.    Appellants Misunderstand the Scope of Congress's Authority. .........12

      A.    Because Section 1621 regulates State and local governments, it is not a valid preemption provision.................13

      B.    Immigration laws are not exempt from constitutional scrutiny. ................................................................14

CONCLUSION .................................................................................16

CERTIFICATE OF COMPLIANCE .......................................................19

CERTIFICATE OF SERVICE ..............................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine*, 527 U.S. 706 (1999) ........................................................8

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015)...............................................................................8

*Avery v. Midland Cty.*, 390 U.S. 474 (1968) ...........................................12

*Carey v. Throwe*, 957 F.3d 468 (4th Cir. 2020)......................................7, 8

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) .........15

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002)...............................................................................9

*City of Los Angeles v. Sessions*, No. CV 18-7347-R,
  2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) .....................................15

*Fragley v. Phelan*, 126 Cal. 383 (1899) ..................................................11

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)......................................... 2, 3, 8

*Highland Farms Dairy v. Agnew*, 300 U.S. 608 (1937) ...........................8

*In re Vargas*, 10 N.Y.S. 3d 579 (App. Div. 2015)....................................9

*Murphy v. Nat'l Collegiate Athl. Ass'n*, 138 S. Ct. 1461 (2018)..................*passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ................1, 2

*New York v. United States*, 505 U.S. 144 (1992)........................... 3, 5, 15

*Oregon v. Trump*, 406 F. Supp. 3d 940 (D. Or. 2019) ...........................15

*Peacock v. Ga. Mun. Asso.*, 247 Ga. 740 (1981) .....................................12

*Printz v. United States*, 521 U.S. 898 (1997)........................................2, 5

*St Louis v. Praprotnik*, 485 U.S. 112 (1988) ..........................................10

**Page(s)**

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ......................................15

**Statutes**

8 U.S.C. § 1621 ........................................................................ *passim*

Va. Code Ann. § 15.2-1102 ......................................................10

Va. Code Ann. § 15.2-1200 ......................................................10

**Constitutional Provisions**

ALASKA CONST. art. X, § 11 ......................................................10

CAL. CONST. art. XI, § 5..........................................................11

ILL. CONST. art. VII, § 6 ..........................................................11

## INTERESTS OF AMICI AND SUMMARY OF ARGUMENT[1]

Amici are cities, counties, and non-profit, non-partisan organizations composed of local government entities and their officials.[2] Across the United States, "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012). Amici represent these governments and their officials. We are responsible for protecting the health, safety, and welfare of our residents, and administering vital local services from public health departments to police departments.

---

[1] No part of this brief was authored by any party's counsel and no person—other than the amici and their counsel—contributed money that was intended to fund preparing or submitting this brief. The parties have consented to the filing of this brief. Amici thank Stanford Law School student Julian Schneider for his substantial assistance in drafting this brief.

[2] Amici cities and counties are the City of Los Angeles, CA; the City of Oakland, CA; the City of Chicago, IL; the City of Seattle, WA; and the County of King, WA. Amicus International Municipal Lawyers Association (IMLA) is a non-profit, nonpartisan professional organization consisting of more than 2,500 members. IMLA's membership is composed of local government entities, including cities, counties, and subdivisions thereof, as represented by their chief legal officers, state municipal leagues, and individual attorneys. IMLA's mission is to advance the responsible development of municipal law through education and advocacy by providing the collective viewpoint of local governments around the country on legal issues before the United States Supreme Court, the United States Courts of Appeals, and in state supreme and appellate courts. Amicus United States Conference of Mayors (USCM) is the official, non-partisan organization of cities with a population of 30,000 or larger. Within USCM, each city is represented by its chief elected official, the mayor.

America's "great innovation of [constitutional] design was . . . establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *Printz v. United States*, 521 U.S. 898, 920 (1997) (internal quotation omitted).  Local governments are an essential part of this design.  They "ensure[] that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' [are] held by governments more local and more accountable than a distant federal bureaucracy." *Sebelius*, 567 U.S. at 536 (quoting The Federalist No. 45, at 293 (J. Madison)).

This promise is guaranteed through "'a residuary and inviolable [State] sovereignty' . . . . [that] is reflected throughout the Constitution's text," and "rendered express by the Tenth Amendment[.]" *Printz*, 521 U.S. at 919 (quoting The Federalist No. 39, at 245 (J. Madison)).  The Tenth Amendment's anti-commandeering doctrine—which prohibits the federal government from issuing orders to State and local governments—preserves "a healthy balance of power between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  This balance allows State and local governments to respond swiftly and appropriately to the needs of their populations.

As Appellants construe it, 8 U.S.C. § 1621 violates these principles.  It

forces States to choose between two unconstitutional options—either of which is an unlawful intrusion on the powers reserved to the States. Either States must obey a prohibition on distributing their *own* funds to undocumented residents, or they must obey a congressional command directing the allocation of State authority and decisionmaking. Neither command is lawful. Nor can Congress absolve a Tenth Amendment violation by offering a choice between unlawful options; this is "no choice at all." *New York v. United States*, 505 U.S. 144, 176 (1992).

At base, section 1621 undermines the political accountability that the Tenth Amendment preserves. "When Congress itself regulates, the responsibility for the benefits and burdens of the regulation is apparent. . . . [But] if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred." *Murphy v. Nat'l Collegiate Athl. Ass'n*, 138 S. Ct. 1461, 1477 (2018). Under Appellants' interpretation, the statute is unambiguously unconstitutional—and a reminder of "the risk of tyranny and abuse" inherent in federal intrusions in State and local governance. *Gregory*, 501 U.S. at 458.

## ARGUMENT

### I. Appellants' Construction of Section 1621 Forces State and Local Governments to Choose Between Two Unconstitutional Options.

Section 1621 forces State and local governments to choose between two

options when it comes to providing most benefits to undocumented residents.[3]
Under Appellants' characterization of the choices available, neither is within
Congress's authority to impose.

Appellants interpret section 1621 as "prohibit[ing] unlawfully present aliens
from receiving state and local public benefits unless the state legislature
affirmatively authorizes it." Appellants' Br. at 3. Under this reading, the choice is
simple. Either State and local governments obey a Congressional command not to
authorize local benefits for undocumented residents,[4] or they structure their

---

[3] As relevant here, section 1621 provides:

> [(a)] Notwithstanding any other provision of law and except as provided in
> subsections (b) and (d), an alien who is not—
>
> (1) a qualified alien (as defined in section 431 [8 USCS § 1641]),
>
> (2) a nonimmigrant under the Immigration and Nationality Act, or
>
> (3) an alien who is paroled into the United States under section 212(d)(5) of
> such Act [8 USCS § 1182(d)(5)] for less than one year,
>
> is not eligible for any State or local public benefit . . . .
>
> [(d)] A State may provide that an alien who is not lawfully present in the
> United States is eligible for any State or local public benefit for which such
> alien would otherwise be ineligible under subsection (a) only through the
> enactment of a State law after the date of the enactment of this Act [enacted
> Aug. 22, 1996] which affirmatively provides for such eligibility.

8 U.S.C. § 1621.

[4] Amici use the term "undocumented residents" to refer to aliens who do not fall
within the categories set out in 8 U.S.C. § 1621(a)(1)-(3), and whom the statute
purports to render ineligible for State or local public benefits.

internal decisionmaking according to Congress's preferences.  This prescription

violates the Tenth Amendment because Congress does not have the power to force

*either* option on State and local governments.[5]  "A choice between two

unconstitutionally coercive regulatory techniques is no choice at all."  *New York*,

505 U.S. at 176.

    A. *Option 1: Obey an unconstitutional prohibition on State and local
lawmaking.*

The anticommandeering doctrine reflects a commitment to principles of

federalism; "using the States as instruments of federal governance [is] both

ineffectual and provocative of federal-state conflict."  *Printz*, 521 U.S. at 919.  As

a result, when it comes to the Tenth Amendment, "one thing is clear: The Federal

Government may not compel the States to enact or administer a federal regulatory

program."  *New York*, 505 U.S. at 188.  Under Appellant's reading, section 1621(a)

unlawfully directs the content of State and local law as part of a federal program.

As Appellants read section 1621(a), it is no different from the federal "anti-

authorization" provision struck down in *Murphy*.  In *Murphy*, the federal

---

[5] The anti-commandeering doctrine prohibits federal commandeering of both
States and local governments.  "'The local or municipal authorities form distinct
and independent portions of the supremacy, no more subject, within their
respective spheres, to the general authority than the general authority is subject to
them, within its own sphere.'"  *Printz*, 521 U.S. at 920-21 (quoting The Federalist
No. 39, at 245.).

government argued that an "anti-authorization" provision—there, a federal bar on State authorization of certain forms of gambling—cannot violate the Tenth Amendment because it is merely a prohibition on new State laws. The Court disagreed. No matter how it is characterized, the Court concluded, such an "anti-authorization" provision "dictates what a state legislature may and may not do," putting State Legislatures "under the direct control of Congress." *Murphy*, 138 S. Ct. at 1478. The same is true of section 1621's anti-authorization provision: It represents Congress's attempt to dictate the content of State and local governments' laws—and puts those governments under Congress's direct control.

Appellants argue that section 1621 does not violate the anti-commandeering doctrine because "the default . . . is for a State to do nothing," and the law "does not require anything of States." Appellants' Br. at 33. But a *requirement* to do nothing is a prohibition on State action, and the anticommandeering doctrine applies equally to such prohibitions. When Congress regulates the actions of State and local governments—here, by ordering them to refrain from providing locally funded public benefits to a category of residents—it does so in violation of the Constitution. Just as Congress cannot affirmatively order a State's cooperation in a federal regulatory scheme, neither can it "direct[] the States . . . to refrain from enacting a regulation." *Murphy*, 138 S. Ct. at 1479.

Just as in *Murphy*, "there is simply no way to understand the provision prohibiting state authorization as anything other than a direct command to the States.  And that is exactly what the anticommandeering rule does not allow."  *Id.* at 1481.  Whatever the merits of the federal policy preference reflected in section 1621, "'[w]here a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.'"  *Id.* at 1477 (quoting *New York*, 505 U. S. at 178).

B. *Option 2: Obey an unconstitutional command dictating the allocation of State and local decisionmaking authority.*

Appellants attempt to save section 1621 by assuring the Court that State and local governments have another option:  They say that the States can choose to authorize State and local funds for public benefits programs for undocumented residents—albeit only by way of "enactments of [S]tate legislatures."  Appellants' Br. at 33.  And Appellants insist this option cannot be commandeering because it is a "choice."  *Id.*

But "[i]t is . . . immaterial whether states voluntarily choose to be part of a federal program, if Congress lacked the power to create such a program in the first place."  *Carey v. Throwe*, 957 F.3d 468, 481 (4th Cir. 2020).  In *Carey*, this Court recognized that whether a state "voluntarily" complies with a federal statute is irrelevant because "[t]he anticommandeering doctrine turns on the nature of the

federal ask, not the existence vel non of state acquiescence." *Id.*

Accordingly, the relevant question is not whether the State acquiesces to an unconstitutional mandate. Instead, it is whether the mandate itself exceeds Congress's power. Here, the question is whether Congress has the power to dictate the allocation of State and local decisionmaking authority. It does not.

"The Constitution . . . contemplates that a State's government will represent and remain accountable to its own citizens." *Printz*, 521 U.S. at 920. This is precisely why the Tenth Amendment "[p]reserv[es] . . . the States as independent political entities." *Id.* at 919. It is also the principle animating the Court's consistent protection of the States' right to organize their own governments. "Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory*, 501 U.S. at 460; *see also Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 816 (2015) ("States retain autonomy to establish their own governmental processes."); *Alden v. Maine*, 527 U.S. 706, 752 (1999) (clarifying that "[a] State is entitled to order the processes of its own governance," meaning that the federal government cannot "displace a State's allocation of government power and responsibility"); *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937) ("How power shall be distributed by a state among its governmental organs

8

is commonly, if not always, a question for the state itself.").

The reasoning used by the only other court that considered whether section 1621 violates the Tenth Amendment is instructive. There, a New York appellate court held that, even "giving all deference to the federal government's supreme authority to regulate immigration and to determine immigration policy," the Tenth Amendment does not allow the federal government to "mandate the governmental mechanism by which the state may exercise its discretion to opt out of the restrictions imposed by section 1621(a)." *In re Vargas*, 10 N.Y.S. 3d 579, 597 (App. Div. 2015). The court concluded that the right of the States "to structure their governmental decision-making processes as they see fit is essential to the sovereignty protected by the Tenth Amendment." *Id.* at 594. In short, Congress has no power to dictate how States allocate their decisionmaking authority.

The Constitution preserves this "traditional prerogative" of the States to adopt different structures for internal decisionmaking, *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 429 (2002), because those structures matter. State sovereignty includes the ability to delegate State decisionmaking power to local governments; States, in turn, organize decisionmaking in the way that suits their populations. This is reflected in the variety of decisionmaking structures they have adopted. *See St Louis v. Praprotnik*, 485 U.S. 112, 124-25

(1988) (plurality op.) ("The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. . . . [O]ne may expect to find a rich variety of ways in which the power of government is distributed."). Differences among and within States relating to demographics, density, industries, and politics have resulted in nuanced decisions relating to allocation of authority. For example, States have different approaches to what types of local governments have home-rule authority,[6] the subjects on which those governments can exercise that authority, and the scope of the State's preemption power.

Some States, like Alaska, have given their home rule units authority that is as broad as the State's own legislative power. ALASKA CONST. art. X, § 11 ("A home rule borough or city may exercise all legislative powers not prohibited by law or by charter."). Others, like Virginia, have no constitutional home rule provision, though Virginia's statutes grant specific powers to municipalities and counties. Va. Code Ann. §§ 15.2-1102, 15.2-1200.

In many states, the scope and type of local decisionmaking authority depends on the subject matter and form of local government. In California, charter

_____

[6] "Home rule" is the authority to enact locally applicable measures to maintain the welfare of a jurisdiction's residents.

cites (but not general law cities or counties) can adopt laws on "municipal affairs" that cannot be preempted by State law. CAL. CONST. art. XI, § 5(a). This reservation of authority "was enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs." *Fragley v. Phelan*, 126 Cal. 383, 387 (1899) (construing prior version of same provision).

Similarly, in Illinois, counties with elected chief executive officers and municipalities with populations of more than 25,000 are "home rule units," with the authority to "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." ILL. CONST. art. VII, § 6. Other municipalities can elect to become home rule units through referendum; home rule units can also give up their home rule power through referendum. *Id.*

In Georgia, the constitution establishes home rule with specific subject-matter limitations for counties, GA. CONST. art. IX, §2, ¶ I, but leaves home rule for municipalities to the legislature, *id*. art. IX, §2, ¶ II. Even local charter provisions, however, are subject to broad preemption by the legislature. *See Peacock v. Ga.*

*Mun. Asso.*, 247 Ga. 740, 742 (1981).

This diversity is by design. As the Court put it more than four decades ago, the States have adopted, "'varied, pragmatic approach[es] in establishing governments.' . . . That approach has produced a staggering number of governmental units . . . and an even more staggering diversity." *Avery v. Midland Cty.*, 390 U.S. 474, 482-83 (1968) (internal citation omitted). These "institutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens." *Id*. at 481 Section 1621's attempt to collapse this diversity threatens both the Tenth Amendment's structural protections of liberty and its principles of political accountability. *Murphy*, 138 S. Ct. at 1477. The anti-commandeering doctrine bars this attempt.

## II.   Appellants Misunderstand the Scope of Congress's Authority.

Appellants argue that the Tenth Amendment cannot apply to section 1621 for two reasons. First, Appellants argue that "Section 1621 regulates aliens directly," and thus "does not violate the 10th Amendment." Appellants' Br. at 34. Second, they suggest that Congress's enumerated powers cannot be restrained by the Tenth Amendment. The first proposition is a misunderstanding of section 1621, and the second is a misunderstanding of the Constitution. The Court should

not be persuaded by either.

    A. *Because Section 1621 regulates State and local governments, it is not a valid preemption provision.*

Appellants contend that section 1621 does not violate the Tenth Amendment because it regulates private actors, not State and local governments. They argue that it is therefore a valid preemptive provision. *See* Appellants' Br. at 33. It is true that, while Congress may not issue "a direct command to the States," when it "regulates the conduct of *private actors*," it may preempt state regulation of that conduct. *Murphy*, 138 S. Ct. at 1481 (emphasis added). But, to be a valid preemptive provision, the law at issue "must be best read as one that regulates private actors." *Id.* at 1479. Under Appellant's reading, section 1621 cannot be read to regulate private actors.

Section 1621 operates *directly* on State and local governments—alternately compelling and prohibiting conduct by government entities and officials. Under Appellants' reading, if Maryland wanted its local governments to have the power to decide whether to provide benefits to undocumented residents, the Maryland State Legislature would need to pass a law specifically authorizing them to do so. And under their reading, just as with *Murphy's* "anti-authorization" clause, section 1621 purports to tell State legislatures what policies they can adopt—or, alternatively, how they can adopt them. Just as in that case, there "is no way in

which this provision can be understood as a regulation of private actors." *Id.* at 1481. It "does not confer any federal rights on private actors," and "if a private citizen or company" received benefits without Appellants' preferred form of state authorization, section 1621 "would not provide any ground for a civil action by the Attorney General or any other party." *Id.*

Indeed, Appellants' position on preemption cannot be squared with their own claim. Appellants sued Montgomery County for failure to comply with the statute, not the purportedly regulated undocumented residents. And they argue that it is Montgomery County, not any undocumented benefits recipient, that has violated section 1621. Under the logic of Appellants' position, section 1621 must regulate the States and their political subdivisions.

B. *Immigration laws are not exempt from constitutional scrutiny.*

Appellants claim that section 1621 "squarely falls within Congress'[s] Article I authority over immigration," and thus that the Tenth Amendment is irrelevant to this case. Appellants' Br. at 30. Appellants even suggest that a constitutional barrier to an immigration law is questionable. *See id.* at 31, fn. 7 ("The inquiry may very well end with the fact immigration is an exclusive power of the federal government."). But Congress's authority to establish uniform rules for naturalization is not a license to ignore anti-commandeering principles. *See*

*New York*, 505 U.S. at 166 ("We have always understood that even where

Congress has the authority under the Constitution to pass laws requiring or

prohibiting certain acts, it lacks the power directly to compel the States to require

or prohibit those acts.").

 This has been the uniform holding of the courts.  A series of cases from

across the country has held that federal immigration laws are constrained by the

Tenth Amendment.  *See, e.g., United States v. California*, 921 F.3d 865 (9th Cir.

2019) *cert. denied*, __ S.Ct. __, No. 19-532, 2020 WL 3146844 (Jun. 15, 2020);

*Colorado v. United States Department of Justice*, ___ F. Supp. 3d ___, No. 19-cv-

00736-JLK, 2020 WL 1955474 (D. Colo. Apr. 23, 2020);  *Oregon v. Trump*, 406

F. Supp. 3d 940 (D. Or. 2019); *City of Los Angeles v. Sessions*, No. CV 18-7347-R,

2019 WL 1957966 (C.D. Cal. Feb. 15, 2019); *City of Chicago v. Sessions*, 321 F.

Supp. 3d 855 (N.D. Ill. 2018), *aff'd*, 957 F.3d 772 (7th Cir. 2020).  None of these

courts regarded Congressional authority over immigration sufficient to settle the

question of whether the provision was constitutional.  Indeed, as the Ninth Circuit

put it:

> The United States stresses that, in crafting the INA, Congress expected
> cooperation between states and federal immigration authorities. That is
> likely the case. But when questions of federalism are involved, we must
> distinguish between expectations and requirements. In this context, the
> federal government was free to *expect* as much as it wanted, but it could not

*require* California's cooperation without running afoul of the Tenth Amendment.

*United States v. California*, 921 F.3d at 891. Congress has authority over federal immigration policy. This much is undisputed. But that authority does not place federal immigration law above the Constitution.

## CONCLUSION

Appellants construe section 1621 to force State and local governments to choose between two unconstitutional options. But the Tenth Amendment protects against exactly this sort of overreach. The federal government cannot cure a constitutional violation by offering two, equally unconstitutional, options. Accordingly, Amici respectfully request that this Court affirm the decision below.

Dated:  September 16, 2020     Respectfully submitted,

   /s/ *Danielle L. Goldstein*

Michael N. Feuer, City Attorney
Kathleen A. Kenealy, Chief Assistant City
Attorney
Danielle L. Goldstein, Deputy City Attorney
Michael Dundas, Deputy City Attorney
OFFICE OF THE LOS ANGELES CITY ATTORNEY
200 North Spring Street, 14th Floor
Los Angeles, California 90012-4131
Telephone: (213) 978-1882
Facsimile:  (213) 978-2286
danielle.goldstein@lacity.org

*Attorneys for the City of Los Angeles*

Charles W. Thompson, Jr.
Executive Director and General Counsel
Amanda Kellar
Deputy General Counsel
International Municipal Lawyers Association
51 Monroe Street
Suite 404
Rockville, MD 20850

*Attorneys for the International Municipal Lawyers
Association*

*(Additional counsel listed on following page)*

JOHN DANIEL REAVES
General Counsel
The U.S. Conference of Mayors
1200 New Hampshire Avenue NW, Suite 800
Washington, DC 20036
*Attorney for the U.S. Conference of Mayors*

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097
*Attorney for City of Seattle, Washington*

DANIEL T. SATTERBERG
King County Prosecuting Attorney
DAVID J. HACKETT
Senior Deputy Prosecutor
500 Fourth Avenue Suite 900
Seattle, WA 98104
*Attorneys for King County, Washington*

BARBARA J. PARKER
City Attorney, City of Oakland
One Frank Ogawa Plaza, Sixth Floor
Oakland, CA 94612
*Attorney for the City of Oakland, California*

MARK A. FLESSNER
Corporation Counsel
BENNA RUTH SOLOMON
Deputy Corporation Counsel
JUSTIN A. HOUPPERT
Senior Assistant Corporation Counsel
30 N. LaSalle Street
Suite 800
Chicago, IL 60602
*Attorneys for the City of Chicago, Illinois*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,637 words, exclusive of the portions of the brief that are exempted by Federal Rule of Appellate Procedure 32(f).  I certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Dated:  September 16, 2020          By:  */s/ Danielle L. Goldstein*
                                              Danielle L. Goldstein

## CERTIFICATE OF SERVICE

I, Danielle L. Goldstein, hereby certify that I electronically filed this Brief of Amici Curiae Cities, Counties, the International Municipal Lawyers Association, and the U.S. Conference Of Mayors in Support of Appellees and Affirmance with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on September 16, 2020. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed September 16, 2020 at Los Angeles, California.

> _/s/ Danielle L. Goldstein_
> Danielle L. Goldstein